AMERICAN MANUFACTURING COMPANY, INC. (SUCCESSOR BY MERGER TO SAFETY INDUSTRIES, INC.; SUCCESSOR BY LIQUIDATION TO PINTSCH COMPRESSING CORP.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

AMERICAN MANUFACTURING COMPANY, INC. (SUCCESSOR BY MERGER TO SAFETY INDUSTRIES, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4027–65, 4028–65. Filed October 29, 1970.

*David G. Sacks* and *Harold R. Handler*, for the petitioners.
*James Q. Smith*, for the respondent.

FORRESTER, *Judge:* In these consolidated cases respondent has determined deficiencies in petitioner's income taxes as follows:

| Docket No. | Taxable year ended | Deficiency |
|---|---|---|
| 4028–65 | 12/31/55 | $56, 016. 14 |
| 4027–65 | [1] 8/25/58 | 11, 247. 13 |

In amended answers respondent claimed increased deficiencies in petitioner's income taxes as follows:

| Docket No. | Taxable year ended | Additional Deficiency |
|---|---|---|
| 4028–65 | 12/31/55 | $145, 372. 21 |
| 4027–65 | [1] 8/25/58 | 2, 165. 14 |

Concessions having been made, the issues remaining for decision in docket No. 4028–65 are whether distributions, received by a parent corporation in liquidation of its wholly owned American subsidiary after the American subsidiary had transferred for cash all its operating

---

[1] Deficiency is for the short taxable year Jan. 1, 1958–Aug. 25, 1958.

assets to a foreign subsidiary wholly owned by the parent, are to be treated as:

(1) Nontaxable distributions "in complete liquidation" of the American subsidiary under section 332 of the Internal Revenue Code of 1954; [2]

(2) Ordinary dividends taxable under section 301 and section 316; or

(3) "Other property or money" received in a section 368(a)(1)(D) reorganization which is taxable under section 356(a)(2).

If the distributions are taxable under section 356(a)(2), then we must further decide:

(1) Whether in computing the parent's gain, the foreign subsidiary may be deemed to have paid a hypothetical amount of its stock, in addition to cash, for the operating assets of the American subsidiary, which "hypothetical stock" was subsequently transferred to the parent; and

(2) Whether the term "corporation," as utilized in section 356(a)(2), may be interpreted to include both the transferor and transferee subsidiary so that the amount of taxable dividend under that section is ascertained according to the earnings and profits of both subsidiaries.

In docket No. 4027–65, the issue for decision (if a section 368(a)(1)(D) reorganization took place) is whether the American subsidiary must separate the gain realized on assets sold at a gain to the foreign subsidiary from the loss realized on assets sold at a loss to the foreign subsidiary, so that the losses are nondeductible under section 361(b)(2), but the gains are taxable because the nonrecognition provisions of section 361(b)(1)(A) are inapplicable because of the application of section 367 to the transaction.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference.

Petitioner herein is American Manufacturing Co., Inc. (hereinafter sometimes referred to as American), a corporation organized under the laws of the State of Delaware with its principal executive office located in Brooklyn, New York. American is the successor by merger, as of January 22, 1960, to Safety Industries, Inc. (hereinafter sometimes referred to as Safety), a Delaware corporation organized in June 1939, for the purpose of manufacturing railway equipment.

The controversy herein involves the tax consequence of events that

---

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

occurred prior to the merger of American with Safety for which American as the successor to Safety is liable.

Safety kept its books and records and filed its income tax returns on an accrual method of accounting and on the basis of a calendar year. Its income tax returns for taxable years 1955 through 1959, and its final income tax return covering the period January 1, 1960, to January 22, 1960, were filed with the district director of internal revenue, Hartford, Conn.

Prior to and including the year 1958, Safety owned all of the outstanding stock of two corporations. One subsidiary, Pintsch Compressing Corp. (hereinafter sometimes referred to as Pintsch), was a domestic corporation qualifying as a Western Hemisphere trade corporation under section 921. The other, Liquigas, Ltd., was a Canadian corporation which changed its corporate name to Interprovincial Safety Industries, Ltd. (hereinafter sometimes referred to as ISI).

Pintsch was organized under the laws of the State of Delaware on September 1, 1939, as a wholly owned subsidiary of Safety. It kept its books and records and filed its income tax returns on an accrual method of accounting and on the basis of a calendar year. Pintsch's income tax returns for the years 1951 through 1957, and its final return for the short period ended August 25, 1958, were filed with the district director of internal revenue, Hartford, Conn.

Until a few years prior to its merger with American, Safety was engaged primarily in the manufacture of heating, lighting, and air-conditioning equipment for passenger railway cars. However, with the decline of the overall passenger traffic of railroads, Safety diversified its business and became primarily engaged directly and through subsidiaries in the manufacture and sale of industrial scales and weighers, industrial timers and controls, and processing equipment for chemical milling and general process industries. To a lesser degree, Safety or its subsidiaries engaged in the business of servicing electrical, air-conditioning, heating, and lighting equipment on railway passenger cars of certain Southeastern railroads and of providing gas for the heating and lighting of cars of certain Canadian railroads.

In part, Safety's railroad related activities were conducted by Pintsch, one of its wholly owned subsidiaries. Pintsch sold gas to railroads solely for the lighting of passenger, baggage, and postal mail cars. Though Pintsch at one time sold to customers both in the United States and Canada, by 1951 it was no longer selling to any railroads in the United States. It did, however, at that time still have customers and several operating plants in Canada, where one of its principal customers was the Canadian National Railway Co. (hereinafter sometimes referred to as CNR).

Pintsch had entered into a long-term contract with CNR for the

supply of gas in 1942. On June 1, 1951, another agreement was entered into pursuant to which CNR acquired Pintsch's plant and property located in Montreal, Canada, for a price of $200,000. This contract provided that CNR was to lease to Pintsch other land near the acquired property subject to renewal for an additional 25 years upon the same terms. In consideration thereof Pintsch also agreed to construct at its own expense a new plant and buildings on the leased land, suitable for its gas operations and the supply of gas to CNR, according to the 1942 agreement. Clause 12 of this contract provided:

12. That should, in the opinion of the Gas Company, the volume of business at the new plant become insufficient to justify maintenance and operation of the new plant, the Gas Company may discontinue operation of the same, and in such event the Gas Company agrees to sell and assign the building, exclusive of machinery and equipment, which the Gas Company may remove at its own expense without damage to the plant, and should such damage occur the Gas Company agrees to repair the same and will surrender the said lease to the Railway, and will cause the Safety Company to vacate the premises, and the Railway agrees to pay to the Gas Company the cost of the new plant, exclusive of machinery and equipment, or the sum of $125,000, whichever sum is the lesser, from which sum shall be deducted an amount equal to 4% per annum to commence from the date the Gas Company commences operations at the new plant. If the Gas Company fails to remove the said machinery and equipment in the plant, it shall become the property of the Railway without any compensation to the Gas Company.

Pintsch could not assign the agreement or sublet the premises in whole or in part without first having obtained consent of CNR in writing. The plant was completed in 1952 for a cost in excess of $200,000.

By 1956 the trend of Pintsch's business was on the down grade. Railroads were no longer adding gas-lighted cars and no new business could be found for their gas product. As a consequence, the Pintsch management decided to depreciate the corporate assets on its books over a 5-year period so that at the eventual time when Pintsch would terminate its business the book losses would not be so large.

Pintsch's sales, gross income, and net income as reported for the years 1951, 1952, 1953, 1954, 1955, 1956, 1957, and for its final return for 1958 as well as the ratio of net profit to sales, were as follows ('The primary cause of the increase in net profit ratio was a sharp decrease in selling and administrative expense.) :

| Year | Sales | Gross income | Net income | Ratio net profit to sales |
|---|---|---|---|---|
| | | | | *Percent* |
| 1951 | [1] $609, 766. 97 | [1] $285, 974. 15 | [1] $118, 189. 46 | 19. 3 |
| 1952 | 638, 505. 05 | 307, 028. 10 | 128, 999. 12 | 20. 2 |
| 1953 | 564, 947. 74 | 275, 246. 58 | 153, 449. 96 | 27. 1 |
| 1954 | 499, 795. 04 | 246, 934. 94 | 135, 893. 17 | 27. 2 |
| 1955 | 432, 097. 31 | 220, 187. 34 | 109, 349. 45 | 25. 2 |
| 1956 | 418, 519. 30 | 216, 705. 46 | 110, 464. 03 | 26. 2 |
| 1957 | 391, 487. 87 | 187, 222. 37 | 106, 030. 49 | 27. 1 |
| 8/25/58 | 212, 957. 20 | 67, 444. 22 | 12, 376. 09 | ------ |

[1] The sale of Pintsch's plant to CNR, showing a selling price of $170,000 is reflected on the return for this year but no gain on the sale is reflected in income.

At least 95 percent of Pintsch's gross income was earned in Canada in these years.

Some of Safety's other Canadian business was conducted by its wholly owned subsidiary ISI, the stock of which had been purchased by Safety in 1954. Prior to 1958, ISI operated a gas products distribution business in Canada. This business consisted of the sale of bottled liquid propane gas for home and individual use. Its gas product could not be used for lighting railway cars.

ISI's business was rather small in comparison to other Safety enterprises but there was a sizable market in Canada for bottled gas, and considerable room for expansion. However, the management of Safety decided around 1957 or 1958 against any further expansion of the ISI business because the need of capital for such expansion was too great. Between acquisition date in 1954 and January 1, 1956, ISI accumulated an earned surplus in its propane business of $92,864.29 (Canadian dollars) and added a surplus of $41,903.33 (Canadian dollars) in calendar year 1956. As of December 31, 1957, earned surplus had increased to $232,960.44 (Canadian dollars), an increment of $98,192.82 (Canadian dollars) in calendar year 1957.

On July 30, 1957, Safety and its tax counsel made an application for a ruling from the Commissioner of Internal Revenue Service that a contemplated sale of ISI operating assets and a subsequent liquidation of ISI's cash and receivables into its parent, Safety, would be exempt from U.S. income tax under the provisions of sections 332 and 367. After several exchanges of letters and additional information supplied by Safety, the Commissioner gave a favorable ruling on February 7, 1958. The proposed sale was never consummated.

On December 31, 1957, ISI did, however, agree to sell all its assets and rights in the Province of Ontario, to Superior Propane, Ltd. (hereinafter sometimes referred to as Superior), the closing date for this transaction was to be March 31, 1958. From December 31, 1957, to March 31, 1958, ISI was to operate the Ontario business for the account of Superior, ISI to absorb the operating loss, if any, and retain the operating profits, if any, as a management fee. On March 10, 1958, ISI also agreed to sell all its assets and rights in the Province of Quebec to Superior. Closing date for the agreement was also to occur on March 31, 1958. Purchases of certain ISI properties in Quebec were delayed until January 1, 1959, and January 1, 1960. Pending these purchases, the properties were leased by ISI to Superior for a term ending March 31, 1960. The assets comprising the above sale were substantially all ISI's liquid gas facilities.

On July 9, 1958, Safety applied to the Commissioner of Internal Revenue Service for a supplemental ruling to that of February 7,

1958, which involved the additional fact that Pintsch would sell its operating assets to ISI. The ruling request stated:

As originally planned, the major portion of the properties of Liquigas were to be sold to wholly unrelated parties and the company was then to be liquidated into the parent. It is now planned to have Liquigas acquire the operating assets of a wholly-owned U.S. subsidiary, Pintsch Compressing Corporation, operating in Canada as a western hemisphere corporation, at their tax cost value as presently reflected on the books of Pintsch. The assets so acquired would then be included as a portion of the properties which would be distributed in liquidation by Liquigas to the parent. The Pintsch Company will also be liquidated simultaneously. The business assets of Pintsch, which will be received by Safety upon liquidation of Liquigas, under the procedure described above, will be recorded on the books of Safety at the same tax cost basis at which they would have been recorded on its books had they been received directly from Pintsch through liquidation. The purpose of the acquisition of the Pintsch assets by Liquigas is to minimize the recovery of "capital cost allowances" under the Canadian income tax statute thereby in turn minimizing the Canadian income tax liability of Liquigas.

On August 12, 1958, the Commissioner of Internal Revenue Service issued a ruling letter based upon the modified facts set forth in the application and concluded that the liquidation of ISI, as outlined above, would not adversely affect the ruling of February 7, 1958.

The liquidation of ISI was not consummated as contemplated by these requests for rulings. The acquisition of the Pintsch operating assets, however, did take place by written agreement dated August 15, 1958. Pursuant to the written agreement Pintsch transferred its operating assets to ISI for cash and the assumption of certain of its liabilities. Included in the transferred assets was the contract between Pintsch and CNR dated June 1, 1951, at no cost. ISI was to pay to Pintsch $314,776.09 (Canadian dollars) for the following items that were transferred:

| | |
|---|---:|
| Machinery & tools | $120,909.74 |
| Buildings | 667.08 |
| Land | 6,880.67 |
| Leasehold improvements | 112,000.00 |
| Accounts receivable | 60,275.55 |
| Other receivables & accruals | 4,891.66 |
| Inventories | 5,681.53 |
| Prepayments & deferments | 3,469.86 |
| | 314,776.09 |

Payment was made by ISI to Pintsch in the following manner:

| | |
|---|---:|
| Cash (Canadian) | $287,945.15 |
| Assumption of accounts payable | 5,580.94 |
| Assumption of accrued taxes | 4,250.00 |
| Assumption of long-term indebtedness | 17,000.00 |
| | 314,776.09 |

Other than the contract with CNR which the parties (Pintsch and ISI) assigned no value, no selling price and no cost or other basis, the transfer price, accumulated depreciation, cost or other basis, and gain or loss realized for the various groups of property transferred to ISI (other than the aforesaid contract) were as follows:

| | Transfer price | Depreciation allowable | Cost or other basis | Gain | Loss |
|---|---|---|---|---|---|
| Accounts receivable less payables | $45,335.07 | 0 | $45,335.07 | 0 | 0 |
| Inventories | 5,900.78 | 0 | 5,900.78 | 0 | 0 |
| Land | 6,880.67 | 0 | 6,880.67 | 0 | 0 |
| Buildings | 668.91 | $7,626.59 | 8,246.41 | $49.09 | |
| Machinery and equipment | 104,180.84 | 304,446.63 | 301,964.55 | 16,662.92 | |
| Transportation equipment | 16,183.12 | 70,753.16 | 83,965.29 | 2,970.99 | |
| Leasehold improvements | 106,911.15 | 133,403.22 | 297,020.26 | | $56,705.49 |
| | 286,060.94 | 516,229.60 | 839,313.03 | 19,683.00 | 56,705.49 |

On or about August 25, 1958, ISI transferred $286,060.94 [3] in cash to Pintsch. Immediately after the transfer of its operating assets and contract to ISI, and after its receipt of the $286,060.94 from ISI, Pintsch owned only cash and receivables amounting to $1,492,008.25 and had liabilities of $1,285.99. Prior to the transaction, Pintsch's earned surplus was $1,235,144.75. Pintsch's assets and liabilities were transferred to and assumed by Safety on August 25, 1958, pursuant to a resolution of Pintsch's board of directors to liquidate, and the capital investment of Safety in Pintsch in the amount of $292,600, Safety's basis in Pintsch's stock, was removed as an asset from the books and records of Safety.

In its income tax return for the taxable period January 1, 1958, to August 25, 1958, Pintsch claimed a net loss from the sale of property, other than capital assets, in the amount of $33,297.17. Of this amount a total loss of $37,022.49 was attributed by Pintsch to its transaction with ISI, in which it netted losses against gains as follows:

Losses _____ $56,705.49
Gains _____ 19,683.00

Net loss_____ 37,022.49

After August 25, 1958, ISI conducted the business formerly conducted by Pintsch without change. An executive of Safety, James T. Cullen (hereinafter sometimes referred to as James), moved to Montreal, Canada, on October 12, 1958, to conduct the ISI business. He had previously been commuting to Montreal and had had high hopes during that period for expansion of ISI in the gas field for home use, which never materialized.

[3] The difference between the $287,945.18 figure as cash, to be received on the transfer of assets by virtue of the written agreement dated Aug. 15, 1958, and the "Transfer Price" total of $286,060.94 is unexplained, but possibly involves conversion rates.

By December 31, 1958, the earned surplus of ISI had increased to $323,814.17 (Canadian dollars), an increment of $90,853.73 (Canadian dollars) in 1958. Included in the increment in 1958 is a net gain of $125,458.41 (Canadian dollars) on disposal of ISI's property, plant, and equipment in March. Between December 31, 1958, and December 31, 1962, ISI's net sales, gross profit from sales, net profit, and the increase in earned surplus per year (all in Canadian dollars) were as follows:

| Year | Sales | Gross profit | Net profits (before taxes) | Annual increase in earned surplus |
|------|-------|--------------|----------------------------|-----------------------------------|
| 1959 | $317,430.53 | $67,966.51 | $30,800.77 | $9,441.22 |
| 1960 | [1] 505,203.55 | 76,346.94 | [2] (115,725.53) | (78,559.69) |
| 1961 | 283,152.14 | 105,688.40 | 22,214.85 | 22,214.85 |
| 1962 | 100,625.17 | 46,894.85 | 119,451.24 | 120,927.34 |

[1] So stipulated. The discrepancy between this figure and the totals of net sales of gas and of other products in the table immediately below is unexplained.
[2] This loss was attributable to the extent of approximately $80,000 from the distribution and servicing of scales, a department which was started and discontinued by ISI during the year.

The breakdown of net sales and gross profit by ISI of gas to railways and of other products in 1960, 1961, and 1962 (in Canadian dollars) is as follows:

| Year | Gas | | Other products | |
|------|-----|-----|----------------|-----|
| | Sales | Gross profit | Sales | Gross profit |
| 1960 | $230,319.82 | $64,652.06 | $274,892.73 | $11,703.88 |
| 1961 | 212,470.95 | 83,288.34 | 70,681.19 | 22,400.06 |
| 1962 | 75,273.29 | 37,503.01 | 25,351.88 | 9,391.84 |

In November 1961, Canadian Pacific Railways (one of the two remaining gas customers of ISI) gave notice terminating its gas supply contract. Shortly thereafter, and under a 6 months' termination clause, ISI gave notice to CNR that it would terminate its contract to supply gas to them. On July 1, 1962, ISI sold its plant in Montreal to CNR under paragraph 12 of the 1951 agreement between Pintsch and CNR.

On July 24, 1962, American, which by virtue of its merger with Safety on January 22, 1960, had acquired ISI as a subsidiary, requested a ruling from the Commissioner of Internal Revenue concerning the taxable status under sections 332 and 367 of a proposed liquidation of ISI into American. As part of this request, American made the following statement:

PROPOSED TRANSACTION

It is proposed that Interprovincial sell its assets to either a Canadian corporation, Canadian individuals or a Canadian branch of a United States corporation, none of which would be related to American or Interprovincial.

After the sale of assets and payment of liabilities, the only remaining assets would be cash and demand notes payable in U.S. dollars due from a related domestic company, also a subsidiary of American. The cash and demand notes would be transferred to the parent company and Interprovincial would then be liquidated. The balance sheet of Interprovincial as of December 31, 1961, expressed in Canadian dollars, is attached hereto as Exhibit B; and a projected balance sheet and income statement as of June 30, 1962, expressed in Canadian dollars, is attached hereto as Exhibits D and E, respectively.

### BUSINESS PURPOSE

.Sales of gas for heating and lighting cars for certain Canadian Railways have been continuously declining and the Company was notified by the Canadian Pacific Railway that effective June 1962 it wished to discontinue the service provided by the Company. With this cancellation there would not be sufficient remaining business to continue the operation of Interprovincial.

### REQUEST FOR A RULING

The Commissioner of Internal Revenue is requested to rule that Interprovincial is a corporation as defined by Sec. 367 of Internal Revenue Code of 1954 and that the proposed liquidation will qualify as a liquidation under Sec. 332 of the Internal Revenue Code of 1954.

### OPINION OF THE TAXPAYER REGARDING PROPOSED TRANSACTION

It is the opinion of American that a liquidation of this subsidiary is necessary in view of the fact that with the loss of a substantial portion of its income it is not economically feasible to continue the existence of the Company.

After several exchanges of letters and additional information supplied by American, the Commissioner gave a favorable ruling on April 8, 1963, that under section 332(a), no gain or loss would be recognized to American on the receipt by it of ISI property received in complete liquidation. Also, the Commissioner held:

(1) Provided that American includes in ordinary income an amount sufficient to produce an additional Federal income tax of $30,000, the proposed complete liquidation of Interprovincial is not in pursuance of a plan having as one of its principal purposes the avoiding of Federal income taxes within the meaning of section 367 of the Code.

By the end of 1963, ISI, pursuant to a resolution passed by its shareholders on October 23, 1963, had distributed its assets ratably among its shareholders. In 1963, ISI was engaged in no commercial activities. There was a small amount of income from interest on funds on deposit in banks and from the collection of accounts receivable which were not collected before it ceased operations in 1962.

For the year 1955, Safety reported taxable income, as adjusted, of $479,886.96. In its return for 1958, it claimed a net operating loss of $511,764.22. On June 11, 1959, Safety filed an application for a tenta-

tive carryback adjustment to recover taxes paid for 1955 by carrying back its 1958 loss to that year. The application was allowed in the amount claimed, i.e., $244,738.69, plus interest. Respondent's deficiency notice, in docket No. 4028–65, dated April 8, 1965, determined that $185,271.71 of the claimed carryback loss was excessive and assessed a deficiency in the amount of $56,016.14 for the taxable year 1955. This was based upon the theory that in 1958 Safety received a distribution in the amount of $1,490,722.26 from its subsidiary, Pintsch, pursuant to a reorganization described in section 368(a)(1)(D) of the Internal Revenue Code of 1954, which was taxable as a dividend under section 356(a)(2) of the Internal Revenue Code of 1954 in the amount of $1,235,144.75, the alleged gain on the liquidation, but subject to the dividends-received deduction as authorized by section 243 in the amount of 85 percent of the dividend, or $1,049,873.04.

By amendment to his answer, respondent alleged and asserted in the alternative that of the $1,490,722.26 distributed to Safety in 1958, $1,204,661.32 was a section 301 distribution with respect to Pintsch to which the 85-percent dividend-received deduction provided by section 243 of the Code applied in the amount of $1,023,962.11. The remainder of the distribution, to wit, $286,060.94, was determined to be from ISI with Pintsch serving merely as a conduit, and the full amount taxable to Safety as a section 301 dividend without benefit of a section 243, 85-percent dividend-received deduction. Thus, Safety's corrected net operating loss for 1958 available for carry back to 1955 was determined to be $45,004.07 and the resultant deficiency in Safety's income tax for the taxable year 1955 was determined to be $201,388.35.

The respondent further alleged, in the alternative, and "in further support of an increased deficiency" that should the distributions not be taxable under section 301, then they were other property or money which would be treated as a dividend under section 356(a).

In docket No. 4027–65, liability has been determined by respondent against petitioner for an asserted deficiency against Pintsch for its final taxable period, January 1, 1958, through August 25, 1958. This deficiency arises from Pintsch's "sale" of its assets to ISI without section 367 clearance. In its final return, Pintsch showed a net loss of $37,022.49 on this "sale." The deficiency notice, dated April 8, 1965, disallowed this loss and determined a liability in the amount of $11,247.13, "because it has not been established that such a deduction is allowable."

By amendment to answer, the respondent determined an increased liability in the amount of $2,165.14. In support thereof, respondent determined that the loss on the sale of assets to ISI, in the amount of $56,705.49, was incurred pursuant to a plan of reorganization under

section 368(a)(1)(D) and not recognized under section 361. The gain on "the sale," in the amount of $19,683, was determined to be a recognized gain realized pursuant to a plan of reorganization to which section 361 does not apply because neither Safety nor Pintsch obtained a ruling under section 367.

OPINION

*Docket No. 4028–65.*—Pintsch transferred its operating assets to ISI for cash and subsequently liquidated, distributing cash and receivables to its parent corporation, Safety. Petitioner contends that the liquidation qualifies as a "complete liquidation" of a subsidiary into its parent, from which the distributions to Safety are not taxable under section 332.[4]

Respondent argues on the other hand that since Pintsch's business was continued by ISI after the liquidation, no "complete liquidation" occurred and section 332 does not apply. He takes the primary position that the distributions are taxable solely under sections 301(a)[5] and 316(a)[6] as a dividend received in part from Pintsch and in part from ISI, whether or not a reorganization under section 368(a)(1)(D)[7]

---

[4] SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

(a) GENERAL RULE.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.

(b) LIQUIDATIONS TO WHICH SECTION APPLIES.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—

(1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends) ; and either

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year ; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution ; or

[5] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

\*     \*     \*     \*     \*     \*     \*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

[6] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913 \* \* \*

[7] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

\*     \*     \*     \*     \*     \*     \*

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders

also took place. For purposes of his argument, respondent conceded in his amended answer that the dividend received deduction under section 243(a)[8] is applicable to the dividend from Pintsch.

In the alternative, respondent contends that the distributions were received as part of a transaction qualifying as a reorganization under section 368(a)(1)(D) and section 354[9] and that the gain realized is taxable under section 356(a)(2)[10] as a dividend. If this alternative argument is sustained, respondent contends on brief that in computing Safety's gain in the reorganization, a hypothetical $286,060.94 in ISI stock should be added to the distributions received by Safety, as if said stock had been transferred from ISI to Pintsch and then subsequently to Safety.

According to respondent, ISI stock increased its value in the amount of $286,060.94 due to the fact that ISI had acquired Pintsch's operating assets, valued at the same amount, after the transaction was complete and this alleged increase in the stock's value was tantamount to

---

(including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

[8] SEC. 243. DIVIDENDS RECEIVED BY CORPORATIONS.

(a) GENERAL RULE.—In the case of a corporation, there shall be allowed as a deduction an amount equal to the following percentages of the amount received as dividends from a domestic corporation which is subject to taxation under this chapter:

(1) 85 percent, in the case of dividends other than dividends described in paragraph (2) or (3).

[9] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATION.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

*       *       *       *       *       *       *

(b) EXCEPTION.—

(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

[10] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

(a) GAIN ON EXCHANGES.—

(1) RECOGNITION OF GAIN.—If—

(A) section 354 or 355 would apply to an exchange but for the fact that

(B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

(2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

the issuance of $286,060.94 in ISI stock which was "received" by Safety. Further, he argues that $286,060.94 of the amount actually received by Safety should be treated as a distribution from ISI and $1,204,661.32 as a distribution from Pintsch under section 356(a)(2), and, in ascertaining the extent to which the distributions are to be taxed as a dividend under section 356(a)(2), the earnings and profits of each subsidiary are to be applied against its own distributions. In this regard, respondent contends that the term "corporation" in section 356(a)(2) must be interpreted to include both the transferor and transferee corporation, i.e., Pintsch and ISI, when both are owned entirely by the same stockholder. Accordingly, the amount of taxable dividend under that section must be ascertained according to the earnings and profits of both corporations. For purposes of this argument, respondent conceded on brief that the "Pintsch distribution," which is taxable as a dividend, would be subject to the dividend-received deduction under section 243(a).

Finally, if we should compute the gain received by Safety without adding any "hypothetical stock" and ascertain the taxable dividend under section 356(a)(2) only with respect to Pintsch's earnings and profits, respondent has conceded in the statutory notice of deficiency that section 243(a) is applicable to the resulting taxable dividend of Safety.

As is evident from the above summation of the various contentions involved in the instant case, the issues are of a highly complex and technical nature. In the past we have dealt with factual situations and issues closely resembling those which are here under consideration, *James Armour, Inc.*, 43 T.C. 295 (1964) ; *South Texas Rice Warehouse Co.*, 43 T.C. 540 (1965), reversed in part and affirmed in part sub nom. *Davant* v. *Commissioner*, 366 F. 2d 874 (C.A. 5, 1966), certiorari denied 386 U.S. 1016 (1967) ; *Ralph C. Wilson, Sr.*, 46 T.C. 334 (1966), but we have never been called upon to consider the application of the reorganization provisions and the dividend provisions to transactions between wholly owned subsidiaries and their parent in which a liquidation of a subsidiary, purportedly governed by section 332, is involved. In the situations with which we have dealt, parties have sought to be taxed at capital gains rates under section 331 or its predecessors on distributions received in a corporate liquidation which was preceded by a transfer of assets of the liquidating corporation to another corporation in which the parties' stock interest was substantially the same or the same as their interest in the liquidating corporation, *James Armour, Inc., supra; South Texas Rice Warehouse Co., supra; Ralph C. Wilson, Sr., supra; Ethel K. Lesser*, 26 T.C. 306 (1956) ; *Walter S. Heller*, 2 T.C. 371 (1943), affd. 147 F. 2d 376 (C.A. 9, 1945) ; *William M. Liddon*, 22 T.C. 1220 (1954), affd. 230 F. 2d 304 (C.A. 6, 1956), certiorari denied 352 U.S. 824 (1956) ; *John G. Moffat*, 42 T.C. 558

(1964), affd. 363 F. 2d 262 (C.A. 9, 1966), certiorari denied 386 U.S. 1016 (1967); *David T. Grubbs*, 39 T.C. 42 (1962). It has become well settled in this area, better known as the liquidation-reincorporation field, that in determining whether or not the transactions constitute a reorganization, the situation must be considered as it existed at the beginning and end of a series of steps; if it is determined that a statutory reorganization has taken place in which the liquidation was merely a step, the reorganization provisions rather than section 331 take precedence in ascertaining the tax consequences of the distributions made pursuant to the liquidation. See cases cited last above.

Petitioner argues that the step-transaction approach, described above, is inapposite as applied to a subsidiary-into-parent liquidation under section 332, as opposed to section 331. In effect, it contends that such liquidations are governed solely by section 332 and that the reorganization provisions cannot take precedence over a liquidation that falls within that section. Concomitantly, he would have us hold that a "complete liquidation" under section 332 occurs merely upon the dissolution of a corporate form, whether or not the operating assets of the liquidating corporation have been transferred to another corporation of the parent.

Since it is clear in the instant case that corporate form was dissolved and petitioner's contentions, if valid, would be dispositive of the issues herein, we treat them at the outset.

Petitioner's argument is based in part on the proposition that section 332 would be superfluous if the reorganization provisions applied to parent-subsidiary liquidations; in effect, that the predecessor of section 332, section 112(b)(6) of the Revenue Act of 1934 [11] (hereinafter

---

[11] SEC. 112. RECOGNITION OF GAIN OR LOSS.

  (b) EXCHANGES SOLELY IN KIND.—

      \*       \*       \*       \*       \*       \*       \*

    (6) EXCHANGE IN LIQUIDATION.—No gain or loss shall be recognized upon the receipt by a corporation of property (other than money) distributed in complete liquidation of another corporation, if the corporation receiving such property on such exchange was on the date of the enactment of the Revenue Act of 1935 and has continued to be at all times until the exchange, in control of such other corporation. As used in this paragraph "complete liquidation" includes any one of a series of distributions by a corporation in complete cancellation or redemption of all its stock in accordance with a plan of liquidation under which the transfer of the property under the liquidation is to be completed within a time specified in the plan not exceeding five years from the close of the taxable year during which is made the first of the series of distributions under the plan. If such transfer of property is not completed within the taxable year the Commissioner may require of the taxpayer, as a condition to the non-recognition of gain under this paragraph, such bond, or waiver of the statute of limitations on assessment and collection, or both, as he may deem necessary to insure the assessment and collection of the tax if the transfer of the property is not completed in accordance with the plan. This paragraph shall not apply to any liquidation if any distribution in pursuance thereof has been made before the date of the enactment of the Revenue Act of 1935.

      \*       \*       \*       \*       \*       \*       \*

  (h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

218

sometimes referred to as section 112(b)(6)), which was added to the 1934 Act by section 110(a) of the Revenue Act of 1935, 49 Stat. 1020-1021, was enacted because Congress intended or believed that the reorganization provisions were not applicable in any case where such liquidations took place.

Petitioner finds support for the above argument in the fact that section 112(b)(6) and its progeny changed the result of such cases as *Rogan* v. *Starr Piano Co., Pacific Division*, 139 F. 2d 671 (C.A. 9, 1943), and *Gutbro Holding Co.*, 47 B.T.A. 374 (1942), revd. 138 F. 2d 16 (C.A. 2, 1943).[12] These cases held that a "statutory merger or consolidation" of a subsidiary corporation and its parent constituted a reorganization under section 112(g)(1)(A) of the Revenue Act of 1934,[13] 48 Stat. 705 (hereinafter sometimes referred to as section 112(g)(1)(A), but that the nonrecognition provisions of section 112 (b)(3) and (4) of the Revenue Act of 1934,[14] 48 Stat. 704 (hereinafter sometimes referred to as section 112(b)(3) and (4)), did not apply to the parent's receipt of the subsidiary's assets because there was no exchange of stock as required by those sections. Both courts held that the transaction was controlled by section 115(c) of the Revenue Act of 1934,[15] 48 Stat. 711 (hereinafter sometimes referred to as 115(c)), and constituted a "complete liquidation," the distributions from which were taxable at capital gains rates under that section. In both cases there was no more than a complete merger of the parent and subsidiary, with no intracorporate transaction prior thereto and no stock transferred.

We are at a loss to see in what way the above cases could possibly substantiate petitioner's contentions. Quite to the contrary, they indicate that section 332 is not superfluous, since (absent its enactment) under these decisions, the liquidation of a subsidiary into its parent, not preceded by other intracorporate transactions and stock transfers, would be taxed at capital gains rates under section 331 (the present-

[12] The Second Circuit reversed on the ground that the nonrecognition applied, since a stock exchange would have been an idle gesture. The "stock was 'exchanged' within the meaning of the term in section 112(b)(3) as though the useless handling of the pieces of paper had taken place." (138 F. 2d at 20.)
[13] SEC. 112(g). DEFINITION OF REORGANIZATION.—As used in this section and section 113—
(1) the term "reorganization" means (A) a statutory merger or consolidation * * *
[14] SEC. 112(b)(3). STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
(4) SAME—GAIN OF CORPORATION.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.
[15] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.
(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. * * *

day equivalent of section 115 (c)), whether or not cast in the form of a "merger or consolidation" which qualifies under section 368 (a) (1) (A) (the present-day equivalent of section 112 (g) (1) (A)). Also, the cases deal only with one type of reorganization under section 368 (a). They furnish no authority for the proposition that the requirements for a reorganization under some other provisions of section 368 are not met if a different factual context prevails, nor are they authority for the proposition that the exchange requirements of section 354 (the present-day equivalent of section 112 (b) (3)) are not met in other factually different situations involving subsidiary-into-parent liquidations. Moreover, both cases were decided at a time after the enactment of section 332's predecessor and can have had no bearing on the legislative intent behind that section.

While the above-mentioned cases shed little light on the purposes for enactment of section 112 (b) (6), the legislative history is more revealing. This section was enacted to encourage the simplification of corporate structures by allowing nonrecognition treatment for a liquidation of a subsidiary in which the parent had the requisite control. 80 Cong. Rec. 8799 (1935) (Senate discussion); Confidential Hearings on H.R. 12395 before the Senate Committee on Finance, 74th Cong., 2d Sess., pt. 1, p. 71 (1936). Prior to the enactment of section 112 (b) (6), the view was expressed by witnesses before the Senate Finance Committee that section 115 (c) was applicable to subsidiary-parent liquidations with distributions made pursuant thereto taxable at capital gain rates under section 115 (c). Hearings on H.R. 8974 before the Senate Committee on Finance, 74th Cong., 1st Sess., pp. 171, 302 (1935). It was also expressed in these hearings that section 112 (g) (1) (A) and the nonrecognition provisions would not allow such liquidations to be tax free. Hearings on H.R. 8974 before the Senate Committee on Finance, 74th Cong., 1st Sess., p. 171 (1935). Indeed, in the confidential hearings on the Revenue Act of 1936, consideration was given to changing the reorganization provisions so that a mere liquidation of a subsidiary into its parent would constitute a statutory reorganization, and be treated as such under the nonrecognition provisions. Confidential Hearings on H.R. 12395 before the Senate Committee on Finance, 74th Cong., 2d Sess., pt. 9, pp. 11, 41–43, 85–87 (1936).

The legislative history lends credence to a view that section 332 is intended to cover an area in which the reorganization nonrecognition provisions are inapplicable to a "statutory merger or consolidation" under section 368 (a) (1) (A) that, in substance and effect, is no more than a liquidation of a subsidiary into its parent with all assets going to the parent. Indeed, the regulations under section 332 go further and indicate that the nonrecognition provisions of section 332 take precedence over the reorganization nonrecognition sections, when

stock and other property have been exchanged in a parent-subsidiary merger which would result in recognition of "other property" under the reorganization provisions, but for the fact that section 332 also applied. Sec. 1.332–2 (d) and (e), Income Tax Regs.[16]

The legislative history does not indicate that a liquidation of a subsidiary into its parent cannot be a step in a reorganization falling under the other definitions of section 368, or that the section is exclusive. To be sure, it is arguable that congressional concern was merely with the elimination of a corporate form; that this purpose is fulfilled whether or not the operating assets are transferred to another subsidiary or the parent; and that the reorganization provisions, therefore, should be inapplicable. However, certain forms of corporate transaction have been specifically designated as reorganization. No distinction has been made in the reorganization provisions concerning the character of stock ownership involved, i.e., individuals or corporate. Absent any specific intent in the legislative history of section 332 or specific language to the contrary in that section, we think liquidation treatment under section 332 may be precluded when said liquidation is merely a step, or a part of a plan in a reorganization under section 368(a)(1)(D), even if, in the absence of the reorganization, section 332 would be applicable. Accordingly, if the liquidation of Pintsch was a step in a reorganization, we need not decide whether section 332 would otherwise be applicable.

---

[16] Sec. 1.332–2 Requirements for nonrecognition of gain or loss.

(d) If a transaction constitutes a distribution in complete liquidation within the meaning of the Internal Revenue Code of 1954 and satisfies the requirements of section 332, it is not material that it is otherwise described under the local law. If a liquidating corporation distributes all of its property in complete liquidation and if pursuant to the plan for such complete liquidation a corporation owning the specified amount of stock in the liquidating corporation receives property constituting amounts distributed in complete liquidation within the meaning of the Code and also receives other property attributable to shares not owned by it, the transfer of the property to the recipient corporation shall not be treated, by reason of the receipt of such other property, as not being a distribution (or one of a series of distributions) in complete cancellation or redemption of all of the stock of the liquidating corporation within the meaning of section 332, even though for purposes of those provisions relating to corporate reorganizations the amount received by the recipient corporation in excess of its ratable share is regarded as acquired upon the issuance of its stock or securities in a tax-free exchange as described in section 361 and the cancellation or redemption of the stock not owned by the recipient corporation is treated as occurring as a result of a tax-free exchange described in section 354.

(e) The application of these rules may be illustrated by the following example:

Example. On September 1, 1954, the M Corporation had outstanding capital stock consisting of 3,000 shares of common stock, par value $100 a share, and 1,000 shares of preferred stock, par value $100 a share, which preferred stock was limited and preferred as to dividends and had no voting rights. On that date, and thereafter until the date of dissolution of the M Corporation, the O Corporation owned 2,500 shares of common stock of the M Corporation. By statutory merger consummated on October 1, 1954, pursuant to a plan of liquidation adopted on September 1, 1954, the M Corporation was merged into the O Corporation, the O Corporation under the plan issuing stock which was received by the other holders of the stock of the M Corporation. The receipt by the O Corporation of the properties of the M Corporation is a distribution received by the O Corporation in complete liquidation of the M Corporation within the meaning of section 332, and no gain or loss is recognized as the result of the receipt of such properties.

Literally the transactions in the instant case fall within the definition of a section 368(a)(1)(D) reorganization. A part of the assets of Pintsch was transferred to ISI and immediately thereafter Pintsch's only shareholder was in control of ISI. Petitioner, however, contends that the requirements of section 354, which also must be fulfilled in order to constitute these transactions a section 368(a)(1)(D) reorganization, have not been met. According to him, Pintsch did not transfer "substantially all" its assets to ISI, nor did an exchange or a distribution of stock of ISI take place, as required by that section. We need not deal at length with petitioner's latter contention. Suffice it to say that both a distribution and an exchange of stock would have been meaningless gestures in such a situation as is here involved, since Safety already owned all the stock of ISI at the outset. It has become well settled that in such a case these requirements of section 354(a)(1) and 354(b)(1)(B) are met. *James Armour, Inc., supra* at 307–308; *Ralph C. Wilson, Sr., supra* at 343–344.[17]

Petitioner's first contention deserves more attention. He argues that section 354(b)(1)(A)'s requirement that "substantially all" the assets of the transferor be transferred, cannot be met because less than 20 percent of the assets of Pintsch were transferred to ISI. He would have us apply a percentage test in ascertaining whether this provision has been met. In *John G. Moffat, supra* at 578, however, we stated, in the course of holding that section 354(b)(1)(A)'s requirements had been met, that the "substantially all" requirement "has been subjected to [a] construction which in effect applies a continuity test rather than mere blind percentages." We noted in *Moffat* that the transferee "finally wound up with all the assets that were necessary or appropriate to the conduct of the [transferor's] business." (42 T.C. at 579.) Also, in *James Armour, Inc., supra*, we stated, after summarizing the transfers which had been made (43 T.C. at 309):

Thus, it will be seen that as a result of the transactions Excavating either acquired title to, or the use of, all the assets essential to the conduct of the business enterprise. It seems clear that the assets which it did not acquire, namely, cash and accounts receivable, were not necessary to the conduct of the enterprise. If such unneeded assets had been distributed to the petitioners prior to the transfer of the essential assets to Excavating there clearly would be no

---

[17] Though *Armour* and *Wilson* dealt with sec. 331 rather than 332, the underlying policy reasons behind these decisions still apply, though in modified form. In these cases, as well as others where a liquidation-reincorporation question under sec. 331 is involved, the reorganization provisions are utilized to prevent " 'a device whereby it has been attempted to withdraw corporate earnings at capital gains rates [under sec. 331] by distributing all of the assets of a corporation in complete liquidation and promptly reincorporating the business assets.' " *Ralph C. Wilson, Sr.*, 46 T.C. at 348. In the instant case, the reorganization provisions, if applicable, would be utilized to prevent avoidance of taxation under sec. 243(a) on 15 percent of "dividends" received by a parent from its subsidiary. (We note that under sec. 243(a)(3) in certain cases there is allowed a 100-percent credit. This subsection was enacted subsequent to the time of the transactions herein under consideration by Pub. L. 88–272 (1962) and accordingly has no bearing on the instant transaction.)

question that substantially all of *Armour, Inc.'s* assets were acquired by Excavating. As pointed out in *Commissioner* v. *First National Bank of Altoona, supra,* the date of distribution is not decisive in such a situation as is here presented. Accordingly, we conclude that substantially all of the assets of *Armour, Inc.,* were acquired by Excavating within the contemplation of section 354(b) (1)(A) of the Code.

In the instant case it is clear that all *operating* assets of Pintsch were transferred to ISI. Of equal significance the long-term contracts between Pintsch and the Canadian railroads, the very foundation for the business as it then existed, were also transferred. The business thereafter operated uninterrupted under the ISI corporate form. As in the *Armour* case, the remaining assets, accounts receivables and cash, "were not necessary to the conduct of the business." If these assets had been distributed before the transfer, the requirements would easily have been met. The fact that they were transferred after, should, under these circumstances, not be decisive. We hold, therefore, that section 354(b)(1)(A) has been satisfied. It would serve no useful purpose here to discuss at length the cases cited by petitioner to uphold his contrary contention. *Simon* v. *United States,* 402 F. 2d 272 (Ct. Cl. 1968) and *Rommer* v. *United States,* 268 F. Supp. 740 (D.N.J. 1966), cited by petitioner, are distinguishable on their facts. *Richard K. Mellon,* 12 T.C. 90 (1949), aff'd. 184 F. 2d 157 (C.A. 3, 1950); and *Helvering* v. *Elkhorn Coal Co.,* 95 F. 2d 732 (C.A. 4, 1937), also cited by petitioner, have been adequately dealt with in *Ralph C. Wilson, Sr., supra* at 346, fn. 17.

Despite the fact that the transactions herein fall within the definition of section 368(a)(1)(D) and section 354, petitioner also contends that the reorganization section is inapplicable because the Pintsch business was in the process, as he terms it, of "winding up." He argues that Pintsch was a failing business and as of 1958 its continuation of operations was anticipated for no longer than 3 years. "Pintsch management fully expect the imminent termination and liquidation of the Pintsch business." According to petitioner, the sale of the assets to ISI was merely to allow ISI to avoid the recapture provisions of the Canadian income tax law and in no way had as its aim the lengthening of that business.

Petitioner's main reliance is on *George D. Graham,* 37 B.T.A. 623 (1938), and *Standard Realization Co.,* 10 T.C. 708 (1948), to substantiate his position that the above facts take this case out of the ambit of section 368(a)(1)(D). In *George D. Graham, supra,* a corporation sold 95 percent of its assets to an unrelated purchaser. It then transferred the remainder of its business, constituting approximately 5 percent of the value of its assets, to a newly formed corporation in exchange for all of such corporation's stock. The original corporation then liquidated, distributing the proceeds of the sale and the stock of

the newly formed córporation to the original shareholders pro rata. The newly formed corporation was organized for the purpose of liquidating the remainder of these assets, and approximately 4 years later, was completely dissolved and liquidated. Its assets were then distributed to the shareholders pro rata.

In deciding whether the transfer of the assets in that case to the newly formed corporation in exchange for stock constituted a reorganization, the Board of Tax Appeals reviewed section 112(i)(1) (B)[18] of the 1932 Revenue Act, 47 Stat. 198, a predecessor of section 368(a)(1)(D). While the transaction fell completely within the literal requirements of the "D" reorganization provision, the Board of Tax Appeals found as follows (37 B.T.A. at 630) :

Nor do we think it was a reorganization within section 112(i)(1)(B) * * * [The successor corporation] was not created pursuant to a plan to reorganize any corporate business, but pursuant to a plan to facilitate the liquidation of a corporation. We think that the statute was not intended to include such a transaction under section 112(i)(1)(B), even though it may come within the definition of the statute, and that the question must be answered in the negative.

Also, in *Standard Realization Corp.*, *supra*, a corporation liquidated after having closed down all its operations. Thereafter, the shareholders transferred its assets to a newly formed corporation which was created solely for the purpose of selling the assets distributed to them. In holding that no reorganization had taken place, we stated (10 T.C. at 714–715) —

to warrant an application of section 112(g)(1)(D), it must appear that there was a transfer to petitioner:

"* * * made 'in pursuance of a plan of reorganization' * * * of corporate business; and not a transfer of assets by one corporation to another in pursuance of a plan having no relation to the business of either * * *. [*Gregory* v. *Helvering*, *supra*.]"

* * * the liquidation of a part of the transferor's assets by the transferee is not such a purpose. It is true that petitioner sold assets and distributed the proceeds to its shareholders, while in the *Gregory* case the transferee merely distributed the assets in kind. Yet the sole object of the transfer in each case: "was the consummation of a preconceived plan, not to reorganize a business or any part of a business but to transfer [assets]. * * *"

Respondent correctly argues that a statutory reorganization may comprise the liquidation of a corporate party to it, citing *Morley Cypress Trust Schedule "B,"* 3 T.C. 84. * * * But in all of these cases there was a continuance of business by the transferee corporation, and that fact was of crucial significance, for, as stressed in *Survaunt* v. *Commissioner, supra:*

"* * * The plan of reorganization must comprehend, and the new corporation created, must when consummated carry on in whole or in part the corporate business of the old corporation. * * * In the *Gregory* case the new corporation

---

[18] SEC. 112(i)(1). The term "reorganization" means * * *

    (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred * * *

did not comply with these requirements of the statute. It never transacted any business connected with or related to the business enterprise carried on by the old corporation."

Conversely, the fact that the business of Pintsch was continued by ISI is of crucial significance in the instant case and serves to distinguish both of the above cases. Accepting that the operation of Pintsch would eventually come to an end and that the transfer of its operating assets had as a purpose the facilitating of certain Canadian income tax determinations of ISI (which we think is adequately supported by the record), the purpose remained, nevertheless, to continue Pintsch's business in ISI until such time as that termination came about; otherwise Safety would have carried out its plans to liquidate ISI as was mentioned in their second request for a ruling from the Commissioner.

After most of the ISI properties were sold or leased to Superior, ISI continued to conduct the Pintsch business. We can only surmise that this operation of the Pintsch business under ISI secured advantages other than reduction of the Canadian taxes, since all of Pintsch's business was then in Canada. Mr. Cullen, himself, stated:

Well, we had a dominion—Interprovincial Safety Industries, Limited was a Dominion corporation, and Pintsch was operating as a branch of a United States company in Canada and it was a better vehicle for us to put the assets of Pintsch into Interprovincial Safety Industries, Limited.

Only when the contracts with Pintsch customers terminated did the termination of ISI business occur and then almost immediately. Then, as stated in American's request for a ruling from the Commissioner as to the tax consequences of an ISI liquidation in 1962, "it [was] no longer economically feasible to continue the existence of the business."

There definitely was no plan here to utilize ISI as a vehicle for the sale of Pintsch's assets. The plan was to eliminate Pintsch as an American corporation and continue its operations, albeit not indefinitely, as a Canadian subsidiary, while hopefully delaying any recapture of income under the Canadian income tax laws. It has been aptly stated elsewhere, *Lewis* v. *Commissioner*, 176 F. 2d 646, 648 (C.A. 1, 1949), affirming 10 T.C. 1080 (1948), that:

"the essence of [a statutory reorganization] is a continuance of the proprietary interests in the continuing enterprise under modified corporate form, the transaction being deemed insufficiently closed economically to justify a tax at the time, except in so far as the stockholder gets something in addition to stock or securities in the reorganized company."

These transactions fall within that intent and, accordingly, we hold that a section 368(a)(1)(D) reorganization has taken place.

The remaining issues for our consideration in this docket involve the treatment to be accorded the distributions received by Safety. Under our decisions in *James Armour, Inc.*, *supra; South Texas Rice*

*Warehouse Co., supra;* and *Ralph C. Wilson, Sr., supra,* the distributions would be treated as a dividend to the extent of the earnings and profits of Pintsch under section 356(a)(2). Section 332 is inapplicable because the liquidation was a step in the reorganization. Petitioner does not dispute the application of section 356(a)(2) and we can certainly agree that these distributions had the "effect of a dividend," as required by that section. Respondent, however, would have us reconsider this aspect of our prior decisions. He argues that the distributions from the liquidation were functionally unrelated to the reorganization which took place, citing *Davant* v. *Commissioner,* 366 F. 2d 874 (C.A. 5, 1966), certiorari denied 386 U.S. 1016 (1967) ; that as a consequence, the distributions do not fall within the ambit of section 356 but rather under some other Code provision. Since, according to respondent, no "complete liquidation" took place under section 332, the distributions must be treated under section 301(a).

*Davant* v. *Commissioner, supra,* had a factual situation analogous to the instant case, though section 331 [19] was involved. In that case one corporation, Warehouse, transferred its operating assets to another, Water, for cash. Thereupon Warehouse dissolved, distributing its assets, namely cash, to its only shareholder. Prior to these transactions and as a part of a preconceived plan, an intermediary purchased the stock of Warehouse from its shareholders, which shareholders also owned all the stock in Water. Thereafter the intermediary had Warehouse sell the assets to Water and then liquidate. The stock had been purchased by the intermediary with a loan, utilizing the stock as collateral. Immediately upon liquidation the loan was repaid with the distributions received by him.

The Fifth Circuit characterized these transactions as follows (366 F. 2d at 882) :

First, $700,000 in earnings and profits possessed by Water were passed through Warehouse to petitioners. Second, $200,000 in earnings and profits from Warehouse were distributed to petitioners. Third, the operating assets of Warehouse were combined with Water and were from that point on owned and controlled through Water. Only one business nontax-avoidance purpose can be found to support any of these events: petitioners wished to eliminate one of the corporate shells and thereafter control all of the properties under one roof. This motive legitimately explains why petitioners transferred the operating assets of Warehouse to Water. But it does not explain either of the first two steps. Under the reorganization provisions of the Code petitioners could have transferred all of Warehouse's assets, including its earnings and profits, to Water without paying any tax. Thus the payment of $200,000 from Warehouse to petitioners cannot be explained as necessary in order to place both businesses

---

[19] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.

   (a) GENERAL RULE.—

      (1) COMPLETE LIQUIDATIONS.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

under the same roof. Likewise, there was no need for petitioners to cast the transfer of Warehouse's operating assets in the form of a sale. The businesses could be combined under one roof without the $700,000 from Water ever coming over to Warehouse. It is apparent that no functional relationship exists between either the $200,000 coming to petitioners from Warehouse or the $700,000 coming to petitioners from Water and the transfer of Warehouse's assets to Water.

After disregarding the sale of stock to the intermediary as a mere step in a plan, the court held that section 331 did not apply and in so doing, appeared to utilize the step-transaction approach as it is applied in the liquidation-reincorporation field. The court did not seem to find it necessary to hold that a reorganization had taken place in order to preclude section 331 treatment, though it did go on to hold that both a section 368(a)(1)(D) and section 368(a)(1)(F) reorganization took place.

In holding further that section 301(a) was applicable to the distributions, the court stated (366 F. 2d 888–889):

Water, if it chose, could have declared the $700,000 as a dividend before the reorganization with Warehouse ever took place. Or Water could have waited and a week, a month or a year later distributed this dividend. Had it chosen any of these courses, the reorganization involving Warehouse would not have been affected in the slightest. We, therefore, hold that the $700,000 received by petitioners from Water is a distribution governed by sections 301(a), 301(c) and 316. The same reasoning demonstrates that $200,000 coming from Warehouse was a dividend since it was functionally unrelated to the reorganization.[28] We, therefore, hold that the $200,000 received by petitioner from Warehouse is a distribution governed by sections 301(a), 301(c) and 316. [Footnote omitted.]

The court also held in the alternative that section 356(a)(2) applied to the distributions.

Respondent would have us adopt the above rationale in the present case and treat the distributions received by Safety as a section 301 dividend. For the reasons hereinafter set forth, we cannot agree.

The essence of the Fifth Circuit's rationale in treating the distributions alternatively under section 301(a) rather than section 356(a)(2) was that they were unnecessary to, or "functionally unrelated to," the reorganization which took place. We can agree that the distributions were unrelated to the reorganization in the sense that the court utilized the term. Both corporations could have declared a dividend, then Warehouse could have sold its operating assets to Water and liquidated its shell. Likewise, in the instant case, both ISI and Pintsch could have declared a dividend before their reorganization took place. However, in many reorganizations where more than stock is given in exchange for stock and section 356(a)(2) is applied, "money or other property" could have been given beforehand as a dividend. In enact-

ing section 203(d)(2) of the Revenue Act of 1924,[20] 43 Stat. 257 (hereinafter sometimes referred to as 203(d)(2)), the predecessor to section 356(a)(2), Congress recognized that legitimate reorganizations could take place concurrently with distributions of "other property" that had the effect of a dividend. In effect, this distribution "dividend" is unnecessary to, or "unrelated to" the legitimate reasons for the reorganization and Congress realized this. We think this is clearly evidenced by the committee reports accompanying the enactment of section 203(d)(2), wherein the following comment with example was given (H. Rept. No. 179, to accompany H.R. 6715, 68th Cong., 1st Sess., pp. 14–15 (1924):

There is no provision of the existing law which corresponds to paragraph (2) of subdivision (d). This subdivision provides that any amount distributed by a corporation in connection with a reorganization which has the effect of a taxable dividend shall be taxed as a dividend and not as a taxable gain.

The necessity for this provision may best be shown by an example: Corporation A has capital stock of $100,000, and earnings and profits accumulated since March 1, 1913, of $50,000. If it distributes the $50,000 as a dividend to its stockholders, the amount distributed will be taxed at the full surtax rates.

On the other hand, corporation A may organize corporation B, to which it transfers all its assets, the consideration for the transfer being the issuance by B of all its stock and $50,000 in cash to the stockholders of corporation A in exchange for their stock in corporation A. Under the existing law, the $50,000 distributed with the stock of corporation B would be taxed, not as a dividend, but as a capital gain, subject only to the 12½ percent rate. The effect of such a distribution is obviously the same as if the corporation had declared out as a dividend its $50,000 earnings and profits. If dividends are to be subject to the full surtax rates, then such an amount so distributed should also be subject to the surtax rates and not to the 12½ percent rate on capital gain. Here again this provision prevents evasions.

See also S. Rept. No. 398, to accompany H.R. 6715, 68th Cong., 1st Sess., pp. 15–16 (1924).

The above committee report indicates that when distributions other than stock were received *in connection with* a reorganization, and had the effect of a dividend, the distributions were to be governed by section 203(d)(2). Moreover, the basic approach of the 1954 Code is the same, i.e., to treat distributions made in connection with a reorganization under the reorganization provisions. The Senate Committee report for the 1954 Act states (S. Rept. No. 1622, to ac-

[20] SEC. 203(d)(2). If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property.

company H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 43, 230 (1954):

> Your committee has also structurally revised the first three parts of the subchapter. Under your committee's bill, part I of the subchapter contains rules primarily devoted to the treatment of current distributions by a corporation, and does not contain rules with respect to distributions pursuant to a recapitalization or other type of reorganization. Part II, as under the House bill, contains rules relating primarily to liquidations. Part III relates only to reorganizations and includes their effects on the shareholders.
>
> \*        \*        \*        \*        \*        \*        \*
>
> Part I of subchapter C provides rules relating to the tax treatment to shareholders of corporate distributions of property. While your committee continues the treatment provided in the House bill under which part I has no application at the corporate level to distributions of property in complete or partial liquidation, your committee's bill, unlike the House bill, does not include in part I rules for distributions made in connection with corporate reorganizations. Under your committee's bill, distributions and exchanges made in connection with reorganization transactions are treated, in general, in part III.

The language of section 203(d)(2) has remained substantially the same since its enactment. No change in substance was intended by its latest reenactment as section 356(a)(2) of the Internal Revenue Code of 1954, S. Rept. No. 1622, to accompany H.R. 8300, 83d Cong., 2d Sess., pp. 51, 269; nor has there been any change in congressional intent to treat the dividend distributions as taxable only to the extent of the "boot" received which is not in excess of the gain realized in the reorganization.

While the distributions in the instant case could have been made beforehand as a dividend, this reason which was utilized by the Fifth Circuit in allowing section 301 application to such distributions is exactly analogous to that reason stated by the committee report, accompanying the enactment of section 203(d)(2), for the enactment and application of that section. The "functionally unrelated" test is no more than an answer to the question: "Could the property have been declared as a dividend before hand?" If the answer is "yes," according to the Fifth Circuit section 301 applies. If this were accepted, section 356(a)(2) would be all but superfluous, for that is exactly the situation contemplated as falling within its purview when a statutory reorganization exists.

We hold that the distributions herein must be treated under section 356(a)(2). They were made in connection with an overall scheme of events, constituting a section 368(a)(1)(D) reorganization and fall within the intent and purposes of section 356(a)(2) treatment. We find nothing in the opinions of *Bazley* v. *Commissioner*, 331 U.S. 737 (1947), and *Gregory* v. *Helvering*, 293 U.S. 465 (1935),

cited by the Fifth Circuit and respondent on brief, which substantiates a contrary position that section 301 may be applied when a section 368 reorganization has taken place. In both cases the predecessors of section 301 were applied, but no statutory reorganization was found to have occurred. In the instant case we have held that a statutory reorganization did take place.

Respondent, on brief, forwarded two other contentions concerning section 356(a)(2), should we decide that it is applicable. He argues that we should hypothesize that $286,060.94 of ISI stock was transferred to Pintsch and then received by Safety when Pintsch liquidated and that this amount should be added to the cash and receivables received by Safety in computing the amount of gain. He relies on the alternative holding in *Davant* v. *Commissioner*, *supra* at 886, for such an argument. Respondent, also relying on *Davant* v. *Commissioner*, *supra* at 889, argues that in determining the amount of taxable dividend, we should consider the earnings and profits of both corporations, treating the sale price of $286,060.94 as a dividend from ISI to the extent of its earnings and profits and treating the remaining sums of other property received as a dividend to the extent of the earnings and profits of Pintsch.

The rationale for respondent's first contention is found in *Davant* v. *Commissioner*, *supra* at 886, wherein the court stated:

Before the transaction the operating assets' value of Warehouse was reflected in the value of its stock. Similarly, the operating assets' value of Water was reflected in the value of its stock. The stockholders had both stocks and their combined certificates reflected the value of their combined operating assets. After the transaction petitioners only had the stock of Water, but it then reflected the value of the combined operating assets of Water and Warehouse. Therefore, the appreciation of the value of Water's stock certificates caused by the transfer of Warehouse's operating assets to Water was the equivalent of issuing $700,000 worth of new or additional stock to Water's stockholders.[26] [Footnote omitted.]

We are unable to follow this reasoning in the instant case. Here, as in *Davant*, the operating assets were transferred but this was not the sole event that occurred. The transferee also transferred the fair market value of the assets in cash to the transferor. There was, therefore, an offset to the value of operating assets received by transferee and the "value" of the transferee's stock remained the same. Hence, the hypothesis that there was an appreciation in the value of ISI's stock is fallacious, and the foundation for asserting that an additional hypothetical value of stock was transferred to Pintsch and then to Safety does not hold "water."

Respondent asserts that to thus hold is to deny that any stock ever passed from ISI, contrary to our holding that the exchange require-

ments of section 354 have been fulfilled. Quite to the contrary, we are being entirely consistent. We have stated that there is no necessity for a stock exchange because it is "a meaningless gesture" and that section 354 does not necessitate a useless task, where the stockholders maintain the same interests in the same going business, although in another corporate shell. Our premise, therefore, is not that a stock has in effect been transferred, but that no stock need ever be transferred in such a case. *James Armour, Inc., supra* at 308; *South Texas Rice Warehouse Co., supra* at 569.

Respondent's second contention with regard to section 356 is purely a matter of statutory construction. He seeks to have us adopt a new interpretation of the term "corporation" in section 356(a)(2), in accordance with the opinion in *Davant* v. *Commissioner, supra*, and contrary to our decisions in *James Armour, Inc., supra, South Texas Warehouse Co., supra,* and *Ralph C. Wilson, Sr., supra,* wherein we held that the term referred only to the transferor's earnings and profits. In construing section 356(a)(2), the Fifth Circuit rationalized that since there was a complete identity of shareholders, the earnings and profits of both corporations should be considered in determining the amount of distributions taxable as a dividend. In this regard, it stated (366 F. 2d at 889):

The statute in speaking of "the corporation" means the corporation controlled by the stockholders receiving the distribution. Where there is complete identity, as here, the stockholders control both corporations and it is virtually impossible to tell which corporation is in reality "the corporation" distributing the cash. We have two corporations each one of which is distributing cash; therefore, we must look at the earnings and profits of both corporations to see if the distribution is essentially equivalent to a dividend or has the effect of a dividend.

We cannot adopt this interpretation.

The legislative history of the section leads to the conclusion that Congress was concerned with a bailout of the earnings and profits of the transferor corporation, and Congress did not seem to consider that there could be, under certain circumstances, a bailout of those of the transferee as well. The committee report of the House, H. Rept. No. 179, *supra* at 14–15, which accompanied section 203(d)(2), the predecessor to 356(a)(2), speaks only in terms of the transferor in the example illustrating the bailout. A reading of sections 354 and 356 together also leads to a singular interpretation of "transferor." Since in section 354 the parties to the exchange described therein are the transferor corporation and its stockholders, it is logical to construe section 356 to limit "the corporation" to the transferor. Nevertheless, respondent would have us adopt a flexible view to effectuate

a "broad Congressional" intent, in order to prevent bailout and close a loophole in the tax law.

While we recognize that in particular circumstances a loophole may exist, yet, in light of the statutory language and the lack of warrant in the congressional history of the statute, we think to adopt respondent's multicorporation interpretation would strain the statutory language too far. We think it is up to Congress to correct this defect which has remained in the Code since its enactment and which in reality only exists in certain limited situations. Accordingly, we hold that the earnings and profits of Pintsch are only to be considered in determining the amount of taxable dividend.

The amount of gain to Safety on the transaction was $1,198,122.26 ($1,490,722.26 minus $292,600, Safety's basis in Pintsch's stock). Since Pintsch's earnings and profits amounted to $1,235,144.75, the entire amount is a dividend taxable under section 356(a)(2). Respondent conceded in his statutory notice of deficiency that section 243(a) is applicable to this amount.

*Docket No. 4027-65.*—In this docket, respondent argues that Pintsch must recognize any gain realized on assets "sold" to ISI at a gain, because the nonrecognition provisions of section 361(b)(1)(A) [21] are inapplicable due to the fact that a section 367 [22] clearance for the reorganization was not obtained. Concomitantly, he argues that the losses of Pintsch, on the sale of assets at a loss to ISI, cannot be recognized under section 361(b)(2). This issue was raised in an amended answer. In his notice of deficiency, respondent had determined that the losses were not to be recognized under section 361(b)(2) but he did not question the nonrecognition of gain under section 361(b)(1)(A).

[21] SEC. 361. NONRECOGNITION OF GAIN OR LOSS TO CORPORATIONS.

(a) GENERAL RULE.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

(b) EXCHANGES NOT SOLELY IN KIND.—

(1) GAIN.—If subsection (a) would apply to an exchange but for the fact that the property received in exchange consists not only of stock or securities permitted by subsection (a) to be received without the recognition of gain, but also of other property or money, then—

(A) if the corporation receiving such other property or money distributes it in pursuance of the plan of reorganization, no gain to the corporation shall be recognized from the exchange, but

*     *     *     *     *     *     *

(2) LOSS.—If subsection (a) would apply to an exchange but for the fact that the property received in exchange consists not only of property permitted by subsection (a) to be received without the recognition of gain or loss, but also of other property or money, then no loss from the exchange shall be recognized.

[22] SEC. 367. FOREIGN CORPORATIONS.

In determining the extent to which gain shall be recognized in the case of any of the exchanges described in sections 332, 351, 354, 355, 356, or 361, a foreign corporation shall not be considered as a corporation unless, before such exchange, it has been established to the satisfaction of the Secretary or his delegate that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. * * *

Petitioner at trial and on brief did not argue that respondent's alternative contention was incorrect, if a reorganization did take place. He relied solely on his contention that no reorganization took place to which section 367 would apply. At the same time, petitioner in the pleadings did not concede that respondent's determination was correct if a reorganization took place. We, therefore, think that the question is still at issue and, accordingly, shall decide the point.

Pursuant to section 367, nonrecognition of gain, under section 361, would be precluded if no clearance for the reorganization was obtained; however, section 361 would still apply to losses. Since it is clear that no clearance was obtained and we have held that a reorganization did take place, the only issue herein concerns the interpretation of the terms "gain" and "loss" in section 361.

The ordinary meaning of "gain" or "loss" in section 361 is the gain or loss on individual assets, therefore it is clear that respondent's determination in his amended answer is correct. The gains, computed separately, would be recognized because section 367 precludes application of section 361(b) (1) (A). At the same time, section 361(b) (2) applies to preclude recognition of the losses.

The only possible argument *contra* is that the terms "gain" or "loss" refer to "net gains" or "net losses." If such were the case, there would be a "net loss" on the entire transaction of sale, which goes unrecognized under section 361(b) (2), and no "net gain" under section 361(b) (1) (A) to which section 367 would apply. Section 361 does not, however, specifically state that "gains or losses" referred to therein are net gains or net losses from the entire transaction of sale; nor does the context of this section indicate that such an interpretation should be placed on the terms. As was stated in *M. F. Reddington Co.* v. *Commissioner*, 131 F. 2d 1014, 1015–1016 (C.A. 2, 1942), affirming a Memorandum Opinion of this Court, where Congress wanted a "net gain" or "net loss" concept, it has so stated in clear and simple language. See, e.g., secs. 1201, 1202, 1212, 1222, 1231, 1302, and 1375(a). There is no such clear language in section 361 and we have been unable to find any case where a "net" concept has been imputed absent such language. We hold, therefore, that the ordinary meaning of gain or loss as referred to therein is the gain or loss on individual assets sold and, accordingly, respondent's alternative determination is upheld. Cf. *Curtis* v. *United States*, 336 F.2d 714, 721–722 (C.A. 6, 1964), affirming 215 F. Supp. 885 (N.D. Ohio 1963) (involving a construction of the terms "gain" and "loss" as utilized in section 356(a) and 356(c)).

Reviewed by the Court.

*Decision will be entered for the respondent in docket No. 4027–65.*

*Decision will be entered under Rule 50 in docket No. 4028–65.*

STERRETT, *J.*, concurring in part and dissenting in part. I concur in the majority view that a D reorganization occurred as the result of the transfer of assets by Pintsch to ISI with Pintsch's sole shareholder remaining in control of the transferee—ISI.

Normally in such transactions the assets are exchanged for stock to meet the statutory requirement that "the transferor, or one or more of its shareholders" be in control of the transferee. Here, the majority, quite properly I believe, looks at the realities of the situation wherein Pintsch's sole shareholder is also the sole shareholder of ISI and finds that a transfer of stock would be superfluous under such circumstances.

In my judgment, however, a realistic appraisal of the transaction requires a conclusion different from that reached by the majority insofar as the treatment of the $286,060.94 ostensibly paid by ISI to Pintsch's for its operating assets is concerned.

There is ample evidence with respect to the business purpose behind the transfer by Pintsch of its operating assets to ISI and subsequent liquidation. However, there is no evidence to support a comparable conclusion concerning the business purpose of the exchange being made for cash. It is difficult to conceive of the business necessity for using cash as the consideration for the transfer. Absent an explanation as to why the exchange was not made in the usual manner, a realistic conclusion to be reached is that Safety, as the sole shareholder of both Pintsch and ISI, availed itself of the opportunity to siphon off the excess cash from ISI by running it through Pintsch and lumping it with the latter's liquidating distribution.

It would seem difficult to conclude from the facts in this case that the cash transfer was in any sense an integral, or even appropriate, part of the reorganization. Having accepted the fact of a reorganization we are under no compulsion to permit the parties to sweep all other exchanges under the same protective umbrella merely because they were made to occur at the same time. To do so would be to allow the statutory scheme to be subverted. See *Davant* v. *Commissioner*, 366 F. 2d 874 (C.A. 5, 1966) ; *Reef Corporation* v. *Commissioner*, 368 F. 2d 125 (C.A. 5, 1966).

The majority would tax the $286,060.94 as "boot" under section 356 (a) (2). In my judgment this is inappropriate for that paragraph is designed to tax cash (or other nonqualifying property) which is received *in addition* to stock. Here the cash paid represents the fair market value of the assets transferred and hence cannot be said to have been paid in addition to stock. Our conclusion that a reorganization took place was premised on the fact that at all times the shareholder of the transferor was in control of the transferee and hence an actual transfer of stock was unnecessary for section 368(a) (1) (D) to apply. This determination does not preclude us from citing the fact that the cash represented the fair market value of the assets transferred

as a basis for the further conclusion that under these circumstances such cash cannot be treated as mere "boot" but rather must be treated outside the reorganization provisions which deal with the effects on shareholders; section 356(a)(2) to be specific.

I would tax the entire $286,060.94 as a dividend to Safety under section 301 of the Code.

---

QUEALY, *J.*, dissenting: In my opinion, there is no basis for the decision of the majority that the liquidation by the parent of its subsidiary should not be governed by section 332. Neither the statute nor sound tax policy justifies such action.

The basic facts are that the parent corporation brought about a sale of certain operating assets from a domestic subsidiary to a foreign subsidiary and then proceeded to liquidate the domestic subsidiary under section 332 of the Code. The business of the domestic subsidiary was thereupon carried on by the foreign subsidiary. The sale of assets from the domestic to the foreign subsidiary was a taxable transaction.

The argument of the respondent, as summarized by the majority opinion, was "that since Pintsch's business was continued by ISI after the liquidation, no 'complete liquidation' occurred and section 332 does not apply." In upholding this argument and accepting the application of section 368(a)(1)(D) to the facts in this case, I believe the majority is in error. The majority, citing *Ralph C. Wilson, Sr.*, 46 T. C. 334 (1966) ; *South Texas Rice Warehouse Co.*, 43 T.C. 540 (1965), reversed in part and affirmed in part sub. nom. *Davant v. Commissioner*, 366 F. 2d 874 (C.A. 5, 1966), certiorari denied 386 U.S. 1022 (1967) ; and *James Armour, Inc.*, 43 T.C. 295 (1964), has disregarded the basic elements of the series of transactions present in this case and has substituted an artificial test wholly at variance with the underlying policy of section 332

In applying the principle enunciated in the cases cited above, the majority makes no distinction between a liquidation of a corporation by its individual shareholders under section 331 and a liquidation by a parent corporation of its subsidiary under section 332. In a liquidation under section 331, it is contemplated that the operating assets of the liquidated corporation will no longer be used by the shareholders to carry on the business in the corporate form. See sec. 1.331–1(c), Income Tax Regs. The courts generally inquire as to whether the business being liquidated is continued in the corporate form by the same shareholders. If there is continuity of business enterprise and proprietary interest, the liquidation under section 331 is not respected and capital gain treatment to the shareholders is denied, e.g., *Davant v. Commissioner, supra.*

These same principles have provided the foundation for decisions by this Court to disregard the sale of assets by a liquidating corporation to a related corporation solely for cash or other property and find that the stock exchange requirements of sections 354 (a) (1) and (b) and 356(a) (1), in the framework of a section 368(a) (1) (D) reorganization, are met when, after a series of transactions is completed, the shareholders of the liquidating corporation retain their proprietary interest in the same going business although in another corporate shell. On this basis, we have consistently held, as the majority does in this instance, that section 368(a) (1) (D) takes precedence over section 331. See *Ralph C. Wilson, Sr., supra* at 344; *South Texas Rice Warehouse Co., supra* at 569; and *James Armour, Inc., supra* at 308.

The reason for applying the reorganization provisions to a liquidation under section 331, followed by a reincorporation of the business, is that to do otherwise would be to grant capital gain treatment to shareholders on distributions from the earnings and profits of the distributing corporation otherwise taxable as dividends. In these circumstances, the additional advantage of obtaining a stepped-up basis for the reincorporated assets is also objectionable. Not to treat the transaction as a distribution of a dividend goes against the basic tenet of subchapter C that a mere readjustment of continuing interest of the individual shareholders under the corporate form does not give rise to a sale or exchange of a capital asset. Nicholson, "Recent Developments in the Reincorporation Area," 19 Tax L. Rev. 123 (1964); Morrison, "The Line Between Liquidations and Reorganizations," 41 Taxes 785 (1963); Rice, "When Is a Liquidation Not a Liquidation for Federal Income Tax Purposes?," 8 Stan. L. Rev. 208 (1956); "A Proposed Treatment of Reincorporation Transactions," 25 Tax L. Rev. 282 (1970).

This thinking is not applicable to section 332, which provides for the liquidation of a subsidiary into a parent corporation. It was never contemplated as a prerequisite to a liquidation under this section that there be a discontinuation of the business in the corporate form.

In enacting section 141 of the Revenue Act of 1934,[1] Congress had severely limited the privilege of allowing affiliated corporations to file consolidated returns and thus greatly increased the potential tax liability of multiple corporations. As aptly pointed out by the majority (see p. 219), section 332 was enacted in 1935 as section 112(b) (6),[2] and reenacted in 1936 and subsequent years, to permit simplification of the corporate structure without the recognition of gain. President Roose-

---

[1] Sec. 141 of the Revenue Act of 1935, 49 Stat. 1014, Pub. L. No. 216, 73d Cong., 2d Sess. (May 10, 1934).

[2] Sec. 110(a) of the Revenue Act of 1935, 49 Stat. 1014, Pub. L. No. 407, 74th Cong., 1st Sess. (August 1935).

velt's message to Congress on Tax Revision, June 19, 1935, 4 The Public Papers and Addresses of Franklin D. Roosevelt 276 (1935) ; 80 Cong. Rec. 8799 (1936) (Senate discussion) ; Confidential Hearings on H.R. 12395 before the Senate Committee on Finance, 74th Cong., 2d Sess., pt. 1, p. 71 (1936) ; 80 Cong. Rec. 10270 (1936) (House discussion on the report of the Conference Committee). See also Hearings on H.R. 8974 before the Senate Committee on Finance, 74th Cong., 1st Sess., pp. 171, 302 (1935), for an expression of this view by witnesses before the committee prior to the enactment of the predecessor of section 332 (section 112(b) (6)) in the Revenue Act of 1935.

In referring to the Revenue Act of 1936 (reenacting the predecessor of section 332), the Supreme Court stated that the provision "made distributions to parent companies nontaxable in order to encourage the simplification of corporate structures. It was avowedly for this reason that section 112(b) (6) provided that no gain or loss to the parent company should in such case be recognized." *Helvering* v. *Credit Alliance Co.*, 316 U.S. 107, 112 (1942). Thus, it is clear that the continuation of the business enterprise was contemplated in section 332 liquidations.

Finally, there is no requirement in section 332, and the legislative history does not indicate that Congress intended, that the business of the liquidated subsidiary be operated as a division of the parent as opposed to being conducted in the corporate form in another subsidiary of the parent. Clearly, no gain or loss would have been recognized if the parent corporation in this case had liquidated its domestic subsidiary and had itself continued the same business with the same assets. There is no reason to adopt a different rule where, as in the case before us, those assets are taken over by another subsidiary. The legislative purpose behind section 332 of encouraging the simplification of corporate structures is fulfilled in this latter situation, as well as in the former one, in that the functions carried on by three corporations prior to the transactions in this case are now being performed by only two corporations.

Furthermore, the principle which is the foundation of objections to granting section 331 exchange treatment to reincorporations, namely, that a readjustment of a continuing interest in property under modified corporate forms is not a proper occasion for the recognition of gain or loss to shareholders, is embodied in section 332. This section does not provide for exchange treatment, and there is no recognition of gain or loss. In addition, in a section 332 liquidation, the parent ordinarily takes a carryover basis under section 334(b) (1),[3] and the

---

[3] I also see no objection to a parent corporation obtaining a sec. 334(b) (2) basis in the assets of a business conducted by a liquidated subsidiary and subsequently transferring those business assets to a new subsidiary rather than operating the business itself.

earnings and profits of the subsidiary are carried over to the parent under section 381.

Under these circumstances, there can be no bailout of the earnings and profits of the subsidiary at capital gain rates as in the case of a section 331 liquidation. Therefore, the major abuse in the reincorporation area is not present in a section 332 liquidation, and there is no basis for the application of an artificial concept which undermines the policy embodied in this section of encouraging the simplification of corporate structures.

In substance, the respondent's only justification for disregarding the liquidation of Pintsch under section 332 results from the fact that prior to liquidation Pintsch sold its operating properties so that only cash and receivables were received by the parent in the liquidation. We have held that the word "property," as used in section 332 (section 112(b)(6) in the 1939 Code), includes money. *International Investment Corporation*, 11 T.C. 678 (1948), affirmed per curiam 175 F. 2d 772 (C.A. 3, 1949). Thus, we have recognized that situations might arise in which the liquidation of a subsidiary under section 332 would result in the receipt of money alone and no other property.[4] Therefore, it is clear that a prior sale of assets is not a bar to a liquidation under section 332. *Burnside Veneer Co.* v. *Commissioner*, 167 F. 2d 214 (C.A. 6, 1948), affirming 8 T.C. 442 (1947) ; *Tri-Lakes S. S. Co.* v. *Commissioner*, 146 F. 2d 970 (C.A. 6, 1945), reversing a Memorandum Opinion of this Court; *International Investment Corporation*, *supra;* *Robert Gage Coal Co.*, 2 T.C. 488 (1943).

A different rule should not apply solely because the sale was made to another corporation, the stock of which was owned or controlled by a common parent, unless it can be shown that the purpose of the sale was to obtain some artificial tax advantage. In the case before us, it is not contended that the sales price varied substantially either from the basis or from the fair market value of the property sold. To give

---

[4] The *International Investment Corporation* case reversed the position adopted by this Court in *Stimson Mill Co.*, 46 B.T.A. 141 (1942), affirmed on different grounds 137 F. 2d 286 (C.A. 9, 1943), that sec. 112(b)(6) (the predecessor of sec. 332) had no application where money alone was distributed to a parent upon the liquidation of a subsidiary.

The *Stimson Mill Co.* decision was contrary to the interpretation placed on this section by G.C.M. 19435, 1938–1 C.B. 176. The decision was also contrary to congressional intent as revealed by a careful consideration of the legislative history of sec. 112(b)(6). See the decision of this Court in the *International Investment Corporation* case in 11 T.C. at 682–683 for an excellent presentation and discussion of this history. Furthermore, in *Robert Gage Coal Co.*, 2 T.C. 488 (1943), and *Burnside Veneer Co.*, 8 T.C. 442 (1947). this Court assumed that "property," as used in sec. 112(b)(6), included money, and in *Tri-Lakes S. S. Co.* v. *Commissioner*, 146 F. 2d 970 (C.A. 6, 1945), reversing a Memorandum Opinion of this Court, and upon the appeal of the *Burnside Veneer Co.* case, the Sixth Circuit held that the term "property," as used in sec. 112(b)(6), included money. On this basis, we held in the *International Investment Corporation* case that we would no longer follow the *Stimson Mill Co.* case upon this question.

recognition to the sale does not result in either the deferment or loss of revenue. To fail to give recognition would be tantamount to holding that a domestic parent or affiliate cannot sell property to a related foreign corporation, irrespective of price.

While I don't agree with the majority, if section 332 is to be disregarded, I would concur with Judge Sterrett's view that the cash transferred by ISI to Pintsch should be treated as a dividend coming from ISI when received by the parent from Pintsch.[5]

---

[5] The resulting tax liability would, of course, be greatly reduced or eliminated by the foreign tax credit under sec. 902.