**Lynn B. CURTIS and Ruth P. Curtis, Plaintiffs-Appellants,**

v.

**The UNITED STATES, Defendant-Appellee.**

**No. 15471.**

United States Court of Appeals Sixth Circuit.

Sept. 22, 1964.

M. J. Stauffer, of Flynn, Py & Kruse, Sandusky, Ohio, for appellants.

Richard J. Heilman, Department of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attorneys, Department of Justice, Washington, D. C., on brief; Merle M. McCurdy, U. S. Atty., Toledo, Ohio, of counsel, for appellee.

Before MILLER, CECIL and EDWARDS, Circuit Judges.

EDWARDS, Circuit Judge.

This is a suit for refund of income taxes assessed by the Commissioner of Internal Revenue and paid under protest. The United States District Judge who heard the case in the United States District Court for the Northern District of Ohio, Western Division, rendered judgment for the government as to the issues herein discussed.

This appeal requires us to consider the purpose and the operation of one of the most debated provisions of federal income tax legislation. We are told that the question posed is a matter of first impression and our own research does not serve to dispute the assertion.

The section in question, enacted into its present form in 1954, is Section 355 (Title 26, U.S.C. § 355) entitled "Distribution of stock and securities of a controlled corporation."

Concerning it and its allied problems, a tax law expert said:

"Like many other areas new to, or substantially changed in, the 1954 Internal Revenue Code, Section 355 is a breeding ground for substantial differences between taxpayers and their government. Advance rulings can avoid many potential disputes. But incautious taxpayers almost certainly will find many of their disputes the subject of litigation for years to come." Dean, Spin-offs, N.Y.U. 15th Inst. on Fed. Tax, 571, 590 (1957).

This appeal is brought by a husband and wife as joint taxpayers. The husband owned 4,100 shares of stock in an old and successful corporation called American Crayon Company, which operated mainly in the school and educational supply fields. In 1957 this company, as a result of negotiation between its executives and principal stockholders

and their opposite numbers in another company, merged with the Joseph Dixon Crucible Company. The Dixon Company was a larger organization with a better profit record in recent years, doing business in the same general fields as American Crayon.

In broadest outline the basic transaction represented a transfer to Dixon of the assets of American Crayon (and the extinguishment of its corporate existence) in exchange for transfer of Dixon stock and debt certificates (deemed equivalent in market value to the book value of the American Crayon assets transferred). The Dixon stock was assigned in proportionate shares to the former American Crayon stockholders. This basic transaction then was primarily an example of a Section 354 merger of a smaller corporation into a larger, with an exchange of assets and corporate existence for stock in the larger corporation. Section 354 provides in pertinent part:

> "*Exchanges of stock and securities in certain reorganizations*
>
> "(a) General rule.—
>
> "(1) In general.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged *solely* for stock or securities in such corporation or in another corporation a party to the reorganization." (Emphasis added.) Title 26 U.S.C. § 354.

The controlling word in this quotation is the word "solely." As a part of the instant transaction, however, the American Crayon stockholders received not only Dixon stock, but also two other evidences of property—the certificates of indebtedness from the Dixon Company previously referred to, and stock in a newly formed company, Kroma, Inc.

Kroma, Inc., was organized to operate a warehouse building owned by American Crayon which Dixon did not want as a part of the merger. At the time of the merger the warehouse was transferred to Kroma, and Kroma stock was distributed to the American Crayon stockholders on the basis of one share for each share of American Crayon stock. It was stipulated that each share of Kroma stock was worth $2.00 at time of distribution.

This stock the Commissioner of Internal Revenue has claimed to be a distribution to former American Crayon stockholders, and hence taxable under Title 26, U.S.C. §§ 301 and 316. The taxpayer-appellants did not declare the value of the Kroma stock in their 1957 income tax return and claim before us that its value should not be regarded as subject to taxation under another section, § 355, because it represented a "spin-off" corporate reorganization of a separate business for legitimate business reasons.

The taxpayers in filing their 1957 tax returns also claimed that the certificates of indebtedness from Dixon were not recognizable for tax purposes. However, at trial of this matter the taxpayers abandoned this position and apparently conceded that this aspect of the total transaction did represent a distribution of assets. They did, however, contest the basis for computation of the taxable amount before the District Court; and they do so before us.

Details of both disputed transactions are set forth in the stipulated facts upon which this matter was heard before the District Judge. Relevant paragraphs of the stipulation follow:

> "1. The American Crayon Company, hereinafter called American, was an Ohio corporation incorporated July 21, 1890, and had its principal office in Sandusky, Ohio. The Joseph Dixon Crucible Company, hereinafter called Dixon, was and is a New Jersey corporation incorporated March 11, 1868, with its principal office in Jersey City, New Jersey. Prior to the merger hereinafter referred to American and Dixon were both engaged in serving the educational, school and stationery fields throughout the United States.
>
> "2. American's manufacturing plant was located on Hayes Street in

Sandusky, Ohio. American also owned the Kroma building on Water Street in Sandusky which it rented. In order to simplify the issues, and for the purpose of this case only, the parties agree that American's manufacturing operation and its rental operation of the Kroma building each constituted the conduct of a separate and active business within the meaning of, and meeting the requirements of, Section 355(a) (1) (C) and (b) of the Internal Revenue Code of 1954.

"3. The first in the series of events that eventually led to a merger of American into Dixon occurred about April 11, 1955, upon the receipt by American of a letter of that date from a broker inquiring whether the owners of American would be interested in a sale or merger of its business. After learning that Dixon was the company interested in American and after investigation of Dixon, American's chief executives were interested in pursuing the prospects of a possible sale of American's assets to Dixon or of a merger of American into Dixon. On July 6, 1955, the broker advised American that Dixon was interested in a combination of the two companies and asked American to formulate an asking price.

"4. During the period of negotiation, the negotiators found themselves consistently in accord on the proposition that a combination of the two companies would enhance the prospects of a profitable business future for both companies. American had been losing part of its market. American's negotiators believed the merger would benefit it by making available for its operation new capital and able young executives. Dixon had a much greater net worth and a larger volume of sales and earnings than American, and maintained substantial cash reserves. American was in need of funds for plant modernization, research, and diversification, and its negotiators hoped to obtain such funds as a result of the merger. American's chief executives were advancing in age without sufficient younger executives available for replacement and its sales organization was not as aggressive as Dixon's. Its negotiators hoped new personnel would become available as a result of the merger. Dixon's sales and profit position was strong and stable whereas American's was declining. The Government will not dispute that American had bona fide business reasons for a merger with Dixon.

"5. The matter that caused the most difficulty throughout the negotiations was the question of American's Kroma warehouse. American's negotiators valued the Kroma warehouse at in excess of $300,000, whereas Dixon did not want the warehouse and initially offered merely to take an option to purchase it for $30,000. The parties never came closer to an agreement with respect to the Kroma warehouse than American's offer to include it in the merger at a value of $192,000, and Dixon's offer to merely take an option for its purchase at a price of $75,000. Because American's negotiators, chief executives and board of directors believed that the proposed combination of American and Dixon was important to a sound and profitable business future for American, they, at the insistence of Dixon's negotiators, deleted the Kroma warehouse from the assets of American that Dixon would acquire if a combination of the two companies could otherwise be agreed upon. It was thereafter understood between the parties to the negotiations that if the combination of the two companies were agreed upon, American would have to make some other disposition of the ownership of the Kroma warehouse.

"6. Another problem arose during the negotiations because Dixon's

negotiators indicated that they believed that sound business procedure required them to obtain protection for Dixon against possible unrecorded, undisclosed or undetermined liabilities of American. This was for the reason that Dixon's negotiators understood that following the proposed merger, Dixon, as the surviving corporation, would be responsible for all obligations and liabilities that would have been the obligations and liabilities of American but for the merger, whether or not such obligations and liabilities, at the time of the merger negotiations, were recorded, disclosed, or determined. The possible American liabilities that Dixon's negotiators were concerned about were tax liabilities, copyright infringements, contract violations, breaches of warranty with respect to manufactured products, claims arising out of American's rental of warehousing facilities and claims of unfair competition which had been made by the Federal Trade Commission in a lengthy action then still pending. In order to obtain the protection for Dixon desired by its negotiators, a part ($113,454) of the purchase price for American's assets was withheld for a period of time, as provided by Articles IV and VI of the merger agreement. Each American shareholder, on the completion of the merger, received a pro-rata share of Dixon's contingent 6% notes representing this sum of money. The parties hereto have stipulated, paragraph 17 infra, that the contingencies mentioned in the merger agreement were sufficiently remote so as not to reduce the fair market value of the notes, as of the date of the merger, below face value."

Exhibit A–1 in this case was a September 30, 1956, balance sheet of the American Crayon Company which showed an "earned surplus" of $832,291.10—an amount considerably in excess of the combined value of the assets transferred to Kroma, Inc., plus the Dixon debt certificates.

The principal question which was before the trial court was whether or not under the total facts in this record the "spin-off" of the Kroma company was entitled to nonrecognition of gain or loss under Section 355 of the Internal Revenue Code of 1954 as contended by the taxpayers, or on the contrary, was properly to be considered a taxable dividend as determined by the Commissioner.

The District Judge answered this question thus:

"It is the Government's position that, where several transactions were in fact merely steps in carrying out one definite preconceived purpose, the object sought and obtained must govern, and that the integrated steps used in effecting the desired result may not be treated separately for tax purposes, citing Koppers Coal Co. v. Commissioner, 6 T.C. 1209; Mellon v. Commissioner, 12 T.C. 90, affirmed on other grounds, 184 F.2d 157 (C.A.3). The Government contends that the transactions herein involved were steps in carrying out a definite preconceived purpose and that, therefore, the several steps cannot be treated separately; that the two concerns here had in mind the merger of American and Dixon, and that the transactions involving Kroma were merely steps to the final result and, therefore, the Kroma transaction cannot be viewed for tax purposes separately and independently from the merger. The Government contends that Section 355 of the Internal Revenue Code of 1954 requires that the distributing corporation, in this case American, must itself engage in the active conduct of a trade or business after the spin-off, and that this requirement was not satisfied in this particular case. With this position of the Defendant we agree."

■ The District Judge was right as a matter of law in concluding that non-

recognition of gain or loss was barred to the taxpayers involved in the "spin-off" by the fact that the parent company went out of existence by virtue of the coincidental merger and was not "engaged immediately after the distribution in the active conduct of a trade or business."

■ We note appellant's argument to the effect that the American Crayon business was actively continued under Dixon ownership with employment of the American Crayon assets and that this fulfilled the limitation of Section 355(b).

If we had no means of ascertaining congressional intent in this regard, the appellant's suggested interpretation would still seem farfetched. Since we do have a means of determining intent, the interpretation sought by appellants appears to us to be prohibited.

It must, of course, be recognized that Section 355 is an exception to a general taxation rule set forth in Section 301 and Section 316. The applicable language in these sections follows:

"*Distribution of property*

"(a) In general.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c)." Title 26, U.S.C. § 301.

\*　\*　\*　\*　\*　\*

"*Dividend defined*

"(a) General rule.—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders—

"(1) out of its earnings and profits accumulated after February 28, 1913, or

"(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

"Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection." Title 26, U.S.C. § 316.

The language in the Revenue Code upon which the taxpayer-appellants rely to exempt them from the provisions quoted above follows:

"Sec. 355. *Distribution of stock and securities of a controlled corporation*

"(a) *Effect on Distributees.*—

"(1) General Rule.—If—

"(A) a corporation (referred to in this section as the 'distributing corporation')—

"(i) distributes to a shareholder, with respect to its stock, or

"(ii) distributes to a security holder, in exchange for its securities, solely stock or securities of a corporation (referred to in this section as 'controlled corporation') which it controls immediately before the distribution,

"(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

"(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

"(D) as part of the distribution, the distributing corporation distributes—

"(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

"(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities." Title 26, U.S.C. § 355.

There is, however, a specific limitation added by the 1951 Amendments which provides:

"(b) *Requirements as to Active Business.*—

"(1) *In general.*—Subsection (a) shall apply only if either—

"(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

"(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business." Title 26, U.S.C. § 355.

The 1951 Amendment originated in the Senate Finance Committee and its report on this provision we quote in full, with the language bearing on intent emphasized by our italics:

"19. Corporate reorganizations (spin-offs).

"Section 317 of your committee's bill adds a new section 112(b) (11) of the code to provide for the non-recognition of gain from the receipt of stock in corporate exchanges carrying out transactions known as spin-offs. A spin-off occurs when a part of the assets of a corporation is transferred to a new corporation and the stock in the latter is distributed to the shareholders of the original corporation without a surrender by the shareholders of stock in the distributing corporations. It is intended that section 317 shall be applicable even though the portion of the business which is spun off is already organized as a separate corporation, with the result that it is the stock of that corporation, rather than the underlying assets, which is transferred to the new corporation whose stock is distributed. For example, if among the assets of corporation A is the stock of a subsidiary corporation B, whether or not wholly or even majority owned, and business reasons exist, unrelated to any desire to make a distribution of earnings and profits to its shareholders, for the separation of the assets consisting of such stock, such separation may be effected without recognition of gain to corporation A or its stockholders by transferring the stock of B to a newly organized corporation C in exchange for its stock, followed by the distribution of C's stock to the stockholders of A without the surrender of their stock.

"This section has been included in the bill because your committee believes that it is economically unsound to impede spin-offs which break-up businesses into a greater number of enterprises, when undertaken for

legitimate business purposes. A similar provision was contained in the revenue revision bill of 1948 which passed the House but was not acted upon by the Senate, and a similar provision was included in the Senate version of the bill which became the Revenue Act of 1950.

"Section 317 has been drafted so as to limit its benefits to reorganizations in which all of the new corporations *as well as the parent* are intended to carry on a business after the reorganization and where only stock (other than preferred) is distributed by the corporation or corporations. Nonrecognition of gain has been denied also in cases where the reorganization was principally a device for the distribution of the earnings and profits of the corporations which are parties to the reorganization. (Emphasis added.)

"Section 317 of the bill also adds a new section 113(a) (23) to the code providing that, in the case of stock distributed in a spin-off, the basis of the new stock, and the old stock, respectively, in the shareholder's hands, is to be determined by allocating between the old stock and the new stock the adjusted basis of the old stock.

"These provisions of your committee's bill are to be effective with respect to taxable years ending after the date of the enactment of this bill, but are to apply only to distributions of stock made after that date." Sen. Rep.No. 781, 82d Cong., 1st Sess. (1951), U.S.Code Congressional and Administrative News, p. 1969.

 It thus appears to us that Congress plainly intended to require that the *parent* company must continue in active existence after a "spin-off" reorganization in order for the resulting stock distribution to qualify for nonrecognition.

The reasons for this limitation (apparently arbitrary on its face) become clear when we read the history of tax exemptions for spin-off corporate reorganizations. The first such exemption was adopted in 1924[1] and was intended (as shown by legislative debate[2]) to be narrowly limited in effect.

The statutory language used, however, proved ineffective in limiting the efforts of taxpayers to employ corporate spin-offs for the purpose of tax free distribution of corporate assets. The net result was repeal of the exemption in its entirety in 1934.[3] The case for nonrecognition of gain in spin-off reorganizations where distribution of assets was neither the purpose nor the result was argued before Congress with vigor in 1951, and Section 355 was adopted. Read in this context the strict limitations of the present Section 355 which we construe became more understandable.

██ We find no warrant for accepting the interpretation of Section 355(b) sought by taxpayer-appellants. Exemptions from general taxation statutes are to be strictly construed. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29 (1955); Helvering v. Northwest Steel Rolling Mills, Inc., 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29 (1940). Nielsen v. United States, 333 F.2d 615 (C.A.6, 1964). Further, the taxpayers' interpretation would, if given effect by us, represent judicial repeal of a condition deliberately considered and duly adopted by Congress. This court, of course, possesses no such power.

The federal District Judge was correct in refusing the refund sought as a result of taxation on the Kroma stock.

The second question posed by this case requires rather less discussion because there appears to be good precedent in relation to it.

1. Section 203(c) of the Int.Rev.Act of 1924, C. 234, 43 Stat. 253.

2. Sen.Rep. No. 398, 68th Cong., 1st Sess. 15 (1924); 1939-1 Cum.Bull., 266, 276.

3. Int.Rev.Act of 1934, C. 277, 48 Stat. 680.

■ The taxpayers acquired their total American Crayon stock in eight different blocks, acquired on eight different dates, at different prices. As to four of these blocks, it is conceded that the merger resulted in net losses, while as to four there was net gain. The Commissioner's determination taxed the net gain without allowing for the losses on the other blocks. The applicable statute provides for nonrecognition of losses:

"(c) Loss.—If—

"(1) section 354 would apply to an exchange, or Section 355 would apply to an exchange or distribution, but for the fact that

"(2) the property received in the exchange or distribution consists not only of property permitted by section 354 or 355 to be received without the recognition of gain or loss, but also of other property or money,

"then no loss from the exchange or distribution shall be recognized." Title 26, U.S.C. § 356(c).

Appellants argue, however, that they should be allowed to average in (or merge) their losses in relation to determination of net gain from their acquisition of the Dixon debt certificates.

The merger question posed here was considered in Lakeside Irr. Co. v. Commissioner, 128 F.2d 418 (C.A.5 1942), cert. denied, 317 U.S. 666, 63 S.Ct. 71, 87 L.Ed. 535 (1942), wherein the court stated:

"On the question whether for tax purposes what happened is one single and inseparable sale or exchange, or may and must be considered as four, no direct authority is cited. We are of opinion that in ascertaining gain and loss by sales or exchanges of property previously purchased, in general each purchase is a separate unit as to which cost and sale price are to be compared. If less than all of a purchase is sold, either a credit on the cost of all is to be entered, or a proportion of the cost is to be attributed to what is sold, as Regulations may have prescribed. If several things separately bought are welded into some physical or business unit, as where bricks, lumber and hardware are made into a house, or machines and buildings are made into a plant, and then sold together, the cost is the aggregate costs of the ingredients, and the sale price is that of the whole, for separation would be impracticable and unreasonable. But where, as here, four unrelated lots of stock were separately acquired and might readily have been separately sold, the fact that after ascertaining the value of each lot all were transferred together for a lump price will not require or authorize a merger of costs. The United States may enquire as to which stocks were disposed of at a profit and tax the profit, and may ignore losses altogether on the disposal of other stocks, though realized at the same time and in the same transaction. Section 24(a) is emphatic in declaring that in the transactions it names, including loss from sales or exchanges between persons related as they are here, 'no deduction shall in any case be allowed'. It seems hard that this is so in this case, because it would have been otherwise had the stocks been sold and the money paid to the creditor stockholder, who might with the money have bought these or like stocks; but thus the statute is written." Lakeside Irr. Co. v. Commissioner, supra at 419.

See also M. F. Reddington v. Commissioner, 131 F.2d 1014 (C.A.2 1942).

We do not feel that any "welding" of these stock purchases was accomplished by the fact of a stock split of American Crayon. Kraus v. Commissioner, 88 F.2d 616 (C.A.2 1937). The original cost basis of these stock lots remained easily identifiable.

Affirmed.