T.C. Memo. 2015-247

UNITED STATES TAX COURT

MICHAEL TSEYTIN AND ELLA TSEYTIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 354-12.

Filed December 28, 2015.

<u>Frank Agostino</u>, <u>Brian D. Burton</u>, and <u>Lawrence A. Sannicandro</u>, for
petitioners.

<u>Marco Franco</u>, for respondent.

MEMORANDUM OPINION

SWIFT, <u>Judge</u>:  Respondent determined a $30,478 deficiency in petitioners'

2007 Federal income tax and a $6,096 penalty under section 6662(a).

For purposes of calculating the amount or portion of the total $23,099,420

that Michael Tseytin (petitioner) received in cash in a corporate merger that is

**[*2]** taxable to him under section 356(a)(1)(B), the two issues for decision are: (1) whether petitioner is to be treated as the owner of the two blocks of stock involved in the merger or whether he is to be treated with respect to one of the blocks of stock merely as an agent or nominee and (2) if he is to be treated as the owner of both blocks of stock, whether petitioner may subtract the $527,298 loss he realized on one of the blocks of stock from the $17,324,565 gain to be recognized on the other block of stock. We must also decide whether petitioner is liable for a penalty under section 6662(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2007, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent has conceded that under section 6015(f) petitioner Ella Tseytin has been relieved from joint and several liability for the tax deficiency and penalty at issue.

## Background

This case was submitted under Rule 122. The stipulated facts are so found. At the time of filing the petition, petitioner resided in New Jersey.

In early 2007 and a number of prior years petitioner owned stock in US Strategies, Inc. (USSI), a New Jersey corporation, which owned a majority (91%) interest in two limited liability companies organized under the laws of the Russian

**[\*3]** Federation, which in turn owned and operated Pizza Hut and Kentucky Fried Chicken franchises throughout the Russian Federation.

Archer Consulting Corp. (Archer), apparently an unrelated legal entity organized under the laws of the British Virgin Islands, owned 250 shares (or 25%) of the issued and outstanding shares of stock in USSI (Archer shares).

Petitioner owned the other 750 shares (or 75%) of the issued and outstanding shares of stock in USSI (non-Archer shares) and had a zero tax basis in the non-Archer shares.

Unidentified key employees of USSI's two limited liability companies owned a minority 9% stock interest in each of the two limited liability companies.

AmRest Holdings, NV (AmRest), a corporation unrelated to USSI and organized under the laws of the Netherlands and the shares of which were publicly traded on the Warsaw Stock Exchange, owned and operated Pizza Hut, Kentucky Fried Chicken, Burger King, and Starbucks franchises throughout Central and Eastern Europe.

In May 2007 USSI, AmRest, and petitioner agreed to the merger of USSI into AmRest. The merger was to qualify as a tax-free reorganization under sections 356 and 368(a), subject to the requirement of section 356(a)(1)(B) regarding cash received in the merger.

**[\*4]**   For the sole purpose of facilitating the transfer and merger of USSI into AmRest, AmRest formed AmRest Acquisition Subsidiary, Inc. (AA Subsidiary), as a wholly owned subsidiary of AmRest.[1]

In order to effect the transfer and merger, petitioner agreed to purchase the Archer shares for $14 million and then to transfer to AmRest 100% of the shares of stock in USSI for a total consideration that turned out to be worth approximately $54 million.

Below we summarize further details regarding the USSI-AmRest merger, the Archer shares, and the transfer of the USSI stock to AmRest.

Merger Agreement

On May 20, 2007, USSI, AmRest, and petitioner entered into the Agreement and Plan of Merger (AmRest agreement).  The AmRest agreement provided that "USSI shall be merged into * * * [AmRest] and the separate existence of USSI shall thereupon cease."

In article 5.4(d) of the AmRest agreement petitioner warranted that before the merger he would hold of record and own beneficially all 1,000 shares of USSI

---

[1]In this opinion and for convenience, hereinafter we ignore AA Subsidiary, and we treat the merger as between USSI and AmRest.

[*5] stock free and clear of any restrictions on transfer, contracts, commitments, equities, claims, or demands.

Under additional terms of the AmRest agreement, in exchange for transferring all of the USSI stock to AmRest, petitioner was to receive as consideration approximately $26.4 million in cash and AmRest stock equal to approximately $21.6 million.[2]

Archer was not a party to the AmRest agreement.

The Archer Shares

As stated, under the May 20, 2007, AmRest agreement petitioner was to acquire the 250 Archer shares he did not then own, and he was to be the owner of 100% of the USSI stock before closing of the USSI-AmRest merger.

On May 25, 2007, petitioner entered into a securities purchase agreement with Archer (Archer agreement), under which he agreed to purchase the Archer shares for $14 million.

Under the Archer agreement, petitioner was to receive "all right, title and interest in and to the Archer shares, free and clear of all liens, claims and other

---

[2]Because of foreign exchange rates, rounding, and differences in the parties' arithmetic calculations, some of the numbers set forth in our opinion are approximate.

**[*6]** encumbrances" and he agreed to purchase the Archer shares for his "own account."

AmRest was not a party to the Archer agreement.

Petitioner's purchase of the Archer shares closed on June 14, 2007.

Further Events and Amended Merger Agreement

In further preparation for the USSI-AmRest merger, petitioner took a number of actions as sole shareholder of USSI, including amending its bylaws, appointing himself its sole director, and giving shareholder approval for the merger.

On July 2, 2007, USSI, AmRest, and petitioner executed an amendment to the AmRest agreement (AmRest amendment) under which the amount of cash petitioner was to receive on the merger was decreased to $23,099,420.

Archer was not a party to the AmRest amendment.

On July 2, 2007, the merger between USSI and AmRest closed. By transfer into his bank account petitioner received the $23,099,420 cash, and he received the AmRest stock which then had a market value of approximately $30,791,390.

On July 5, 2007, from the $23,099,420 cash petitioner received, petitioner paid Archer the $14 million owed to Archer for the Archer shares.

[*7] Both the AmRest agreement and the AmRest amendment specify that each share of USSI stock was being exchanged for an equal portion of the total merger consideration (namely, $53,890,810).[3]

As reflected in the summary below (and treating the Archer and the non-Archer blocks of USSI stock as separate blocks of stock and ignoring petitioner's argument that he never owned the 250 Archer shares), on the basis of a pro rata allocation of the $53,890,810 total merger consideration to all 1,000 shares of USSI stock, petitioner realized on the merger: (1) a $527,298 short-term capital loss on the transfer to AmRest of the 250 Archer shares and (2) a $40,418,107 long-term capital gain on the transfer to AmRest of the 750 Non-Archer shares:

| Item | Archer Shares | Non-Archer Shares |
|---|---|---|
| 250 Archer shares transferred | | |
| 25% of total consideration received | $13,472,702 | |
| Less cost basis | 14,000,000 | |
| Short-term capital loss realized | (527,298) | |
| | | |
| 750 non-Archer shares transferred | | |
| 75% of total consideration received | | $40,418,107 |
| Less cost basis | | -0- |
| Long-term capital gain realized | | 40,418,107 |

[3]$23,099,420 cash + $30,791,390 stock value = $53,890,810.

[*8] Petitioner's Original 2007 Filed Tax Return

On October 15, 2008, petitioner filed his 2007 Form 1040, U.S. Individual Income Tax Return. On Schedule D, Capital Gains and Losses, thereof, petitioner treated the 1,000 shares of stock in USSI involved in the merger as one block of stock, all owned and transferred by him to AmRest.

Petitioner treated the $23,099,420 cash received as taxable, but he reduced that amount by the $5,977,733 portion of his $14 million total cost basis in the USSI stock which he allocated to the cash received.[4]

Accordingly, on his return petitioner reported a net taxable long-term capital gain of $17,121,687 relating to the $23,099,420 cash boot he received on the USSI-AmRest merger and a total Federal income tax due of $3,780,522.

Petitioner's Amended 2007 Tax Return

On October 6, 2009, petitioner submitted to respondent a 2007 Form 1040X, Amended U.S. Individual Income Tax Return.

---

[4]On his original return petitioner's allocation of $5,977,733 of his total cost in the USSI stock to the $23,099,420 cash he received on the merger was calculated using the percentage (42.7%) of the total cash petitioner received divided by the total consideration petitioner received (i.e., $23,099,420 ÷ $54,099,420 = 42.7%).

**[*9]** Consistent with his original return, on Schedule D of his amended return petitioner treated all 1000 shares of stock in USSI as owned and transferred by him to AmRest.

However, inconsistent with his original return, on his amended return petitioner treated the 250 Archer shares as separate from the 750 non-Archer shares, and in calculating the taxable portion of the $23,099,420 total cash petitioner received, petitioner ignored the $30.7 million value of the AmRest shares that he received and that constituted part of the total merger consideration.

First, petitioner treated 25%[5] (or $5,774,855) of the total $23,099,420 cash received as allocable to the 250 Archer shares, and he subtracted therefrom the $14 million cost of the Archer shares, producing on his amended return a claimed short-term capital loss of $8,225,145 relating to his transfer to AmRest of the Archer shares.[6]

Next, petitioner treated the 75% balance (or $17,324,565) of the $23,099,420 total cash received as allocable to the non-Archer shares with a zero basis, and he reported with regard to the non-Archer shares a resulting taxable

---

[5]25% represented the percentage of all USSI shares transferred that constituted Archer shares.

[6]$5,774,855 cash – cost basis of $14,000,000 = a loss of $8,225,145.

[*10] long-term capital gain of $17,324,565, an increase of $202,878 over the $17,121,687 long-term gain reported on his original return relating to the merger.

Petitioner then on his amended return effectively offset or reduced the $17,324,565 long-term capital gain to be recognized relating to the non-Archer shares by the $8,255,245 short-term capital loss on the Archer shares, for a reported net long-term capital gain relating to the USSI-AmRest merger of $9,099,320[7] and a reduced reported total tax liability of $2,577,182.

To date petitioner has paid $2,732,428 toward his 2007 Federal income tax liability, and he now seeks a refund of the amount paid in excess of the $2,577,182 reported tax due.

Respondent's Audit and Determination

On audit and in a notice of deficiency respondent treated the Archer and non-Archer shares of USSI stock as owned by petitioner and as separate blocks of stock with identifiable and different cost bases (as did petitioner on his amended return). Respondent calculated the taxable amount or portion of the $23,099,420 total cash received on the merger using the total $53,890,810 merger consideration--not just the $23,099,420 total cash received (as petitioner had done on his amended return). As a result of respondent's calculations, the amount of

_____

[7]$17,324,565 – $8,225,245 = $9,099,320.

[*11] petitioner's long-term capital gain petitioner realized on the transfer of the non-Archer shares increased to $40,418,107,[8] and the entire $17,324,565 (i.e., 75% of the total cash received allocable to the non-Archer shares) was charged or taxed to petitioner as long-term capital gain.

Reflected below are respondent's calculations relating to the merger separately with respect to the Archer and non-Archer shares of: (1) the short-term capital loss petitioner realized; (2) the long-term capital gain petitioner realized; (3) the amount of petitioner's cost basis allocable to each block of stock; (4) the amount of petitioner's realized loss to be recognized and allowed to reduce the taxable portion of petitioner's long-term capital gain; and (5) the amount or portion of petitioner's realized gain to be recognized and taxed as cash boot. The allocation of the total cash and stock petitioner received is:

| | |
|---|---|
| Total value of cash and stock petitioner received | $53,890,810 |
| 25% allocable to Archer Shares | 13,472,702 |
| 75% allocable to non-Archer shares | 40,418,107 |

---

[8]75% of $53,890,810 = $40,418,107.

| [*12]                Item | Archer Shares | Non-Archer Shares |
|---|---|---|
| Petitioner realized | $13,472,702 | $40,418,107 |
| Less petitioner's cost basis | 14,000,000 | -0- |
| Short-term loss realized | ($527,297) | |
| | | |
| Long-term gain realized | | 40,418,107 |
| Gain/Loss to be recognized and taxed: | | |
| Short-term loss to be recognized | -0- | |
| | | |
| 75% of $23,099,240 cash boot | | 17,324,565 |

As indicated above, relying on the loss disallowance rule of section 356(c), respondent did not allow the $527,297 short-term capital loss realized on the Archer shares to reduce or to be netted against the $40,418,107 long-term capital gain realized on the non-Archer shares or to reduce the $17,324,564 portion of the cash boot to be recognized and taxed.

As a result of the above calculations, respondent determined for petitioner a total 2007 Federal income tax liability of $3,811,000--a deficiency of $30,478 (based on petitioner's originally reported 2007 $3,780,522 tax liability) and a $6,095 accuracy-related penalty under section 6662(a).

[*13]                                Discussion

On brief petitioner acknowledges that on his original 2007 Federal income tax return the 1,000 shares of USSI stock were incorrectly treated as a single block of stock, and he agrees that (as reflected on his amended return) those shares of stock consisted of two separate blocks of stock.

With regard to the Archer shares petitioner makes two arguments. Petitioner argues for the first time that in transferring the Archer shares to AmRest he acted only as a nominee or agent for Archer, that he never owned the Archer shares, and that we should treat the Archer shares as either sold directly by Archer to AmRest or as redeemed by USSI or by AmRest from Archer. According to his argument, petitioner would treat $14 million (the amount paid to Archer for the Archer shares) of the $23,099,420 total cash consideration received from AmRest as not received by him, but rather as received by and taxable to Archer.

In the alternative and if he is to be treated as owner of the Archer shares on their transfer to AmRest, petitioner argues he should be allowed to subtract the $527,297 short-term capital loss realized on the transfer of the Archer shares from the $17,324,564 long-term gain to be recognized and taxed as cash boot.

**[*14]** <u>Petitioner's Agency or Redemption Argument</u>

Although the Commissioner is authorized to look through the form of a transaction to its substance, taxpayers have considerably less freedom to do so. See <u>Estate of Durkin v. Commissioner</u>, 99 T.C. 561 (1992). As the Supreme Court has stated: "[w]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not". <u>Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.</u>, 417 U.S. 134, 149 (1974).

The rule binding taxpayers to the form of their transaction is not absolute. The Court of Appeals for the Third Circuit, to which an appeal of this case would lie, has developed and continues to apply the <u>Danielson</u> rule where a taxpayer seeks to disavow the form of a transaction. The <u>Danielson</u> rule stands for the proposition that, absent proof of mistake, fraud, undue influence, duress, or the like, which would be recognizable under local law in a dispute between the parties to an agreement, a taxpayer generally will be held to the terms or form of an agreement entered into. <u>Commissioner v. Danielson</u>, 378 F.2d 771, 775 (3d Cir. 1967), <u>vacating and remanding</u> 44 T.C. 549 (1965); <u>Life Care Comtys. of Am., Ltd. v. Commissioner</u>, T.C. Memo. 1997-95. This rule, among other things, seeks to prevent taxpayer challenges to the form of an agreement that, if successful,

[*15] would nullify the reasonably predictable tax consequences for other parties to the agreement, grant a unilateral reformation of the contract with a resulting unjust enrichment, or permit a party to use the tax laws to obtain relief from an unfavorable agreement.  See Commissioner v. Danielson, 378 F.2d at 775.

Petitioner has not challenged the agreements before us on the grounds of fraud, mistake, undue influence, duress, or the like.  Under the Danielson rule petitioner is prohibited from challenging the form of the transactions before us.

Even if petitioner were not bound by the form of the transactions he entered into, the stipulated evidence convincingly supports the conclusion that petitioner purchased the Archer shares from Archer on his own behalf and then transferred them to AmRest.

Petitioner warranted he would hold of record and beneficially own all 1,000 shares of USSI stock.  Petitioner received all right, title, and interest in the Archer shares, and he agreed to purchase them for his own account.  Petitioner acted as sole shareholder of USSI, amending USSI's bylaws, appointing himself sole director, and approving the merger.

No persuasive evidence before us would support a finding of a nominee or agency relationship between petitioner and Archer or that the Archer shares of stock in USSI were redeemed from Archer by USSI or by AmRest.

**[\*16]** Petitioner purchased from Archer the Archer shares of stock in USSI in a related and essentially simultaneous transaction independent from the merger and then transferred to AmRest the Archer shares he had purchased.

Neither AmRest nor USSI was a party to the stock purchase agreement between petitioner and Archer. Archer was not a party to the merger agreement between petitioner and AmRest. In the calculations on his original and amended tax returns, petitioner reported the Archer shares as having been owned by him and transferred by him to AmRest. The substance of the transactions before us reflects and is consistent with their form.

As determined by respondent, petitioner is to be treated as the recipient of and is taxable on the portion of the cash boot he received on the merger that is allocable to the Archer shares.

Petitioner's Alternative Argument

Petitioner argues in the alternative that if he is to be treated as owner and transferor to AmRest of the Archer shares and as recipient of the total cash involved in the merger transaction, he should be entitled to subtract the $527,297 loss he realized on the Archer shares against the $17,324,565 gain to be

**[\*17]** recognized on the non-Archer shares and to report a reduced total net long-term capital gain of $16,797,268.[9]

To support his alternative argument, petitioner cites a number of authorities and argues that section 356(c) should be interpreted only as prohibiting the tax recognition of a net bottom line cumulative loss on a merger transaction and that internal netting of losses and gains should be allowed of different blocks of stock involved in a merger transaction up to, but limited by, the total amount of the overall gain to be recognized.

However, petitioner goes much further than any authority which he cites might suggest. As respondent points out, if (contrary to the loss disallowance rule of section 356(c)) internal netting were allowable here it would allow only the $527,297 loss petitioner realized on the Archer shares to reduce the $40,418,107 gain petitioner realized on the non-Archer shares, and petitioner's tax liability herein would be significantly increased over the tax liability determined by respondent (i.e., petitioner would be taxed on the entire $23,099,420 cash boot that he received).[10]

---

[9]$17,324,565 − $527,297 = $16,797,268.

[10]Netting the $527,297 short-term loss realized against the $40,418,107 gain realized produces a net realized gain of $39,890,810, and petitioner would be

(continued...)

**[*18]** We agree with respondent.

Petitioner's argument and citations relating to the internal netting of losses and gains realized on separate blocks of stock in a merger transaction are not apropos and are not helpful to petitioner.  As stated, even if internal netting were allowable, petitioner cites no authority that would allow a loss realized to offset or be netted against a gain to be recognized.  We reject petitioner's alternative argument.

Petitioner argues that in Rev. Rul. 74-515, 1974-2 C.B. 118, the Commissioner rejected a key and relevant part of his earlier ruling in Rev. Rul. 68-23, 1968-1 C.B. 144, in which a loss realized on a block of stock was not allowed to offset a gain realized on another block of stock.  Petitioner cites Gordon E. Warnke, "Developments, Theories and Themes in Stock Basis", 86 Taxes 85, 119-120 (2008), Michael L. Schler, "Rebooting Section 356:  Part 2 -- The Regulations", 128 Tax Notes 379 (2010), and N.Y. State Bar Ass'n Tax Section, "Report on Final Regulations Regarding Allocation of Basis Under Section 358 and Related Matters", Doc 2007-27372; 2007 TNT 241-18 (Dec. 2007).

---

[10](...continued)
required to recognize the amount of that gain limited only by the total $23,099,420 amount of the cash boot received.

**[*19]** Petitioner argues that the 2006 regulations, T.D. 9244, 2006-8 I.R.B. 463, and 2009 proposed regulations, Notice of Proposed Rulemaking, 74 Fed. Reg. 3509, 3509, 3511, 3519 (Jan. 21, 2009), can be construed to allow internal netting of a loss realized on one block of stock against a gain realized on another block of stock so long as a net overall gain is still realized.

Respondent cites Rev. Rul. 68-23, supra, wherein, as stated, the Commissioner concluded that, in determining gain or loss on a merger transaction to which section 356 applies, blocks of stock in which a taxpayer has different bases are to be considered separately, and a loss on one block of stock may not offset or reduce a gain recognized on another block of stock.

Respondent cites the Court of Appeals for the Fifth Circuit's opinion in Lakeside Irr. Co. v. Commissioner, 128 F.2d 418 (5th Cir. 1942), aff'g 41 B.T.A. 892 (1940), involving the loss disallowance rule of section 267 applicable to related party transactions. In that case the Court of Appeals affirmed a decision of the Board of Tax Appeals and explained:

> But where, as here, four unrelated lots of stock were separately
> acquired and might readily have been separately sold, the fact that
> after ascertaining the value of each lot all were transferred together
> for a lump price will not require or authorize a merger of costs. The
> United States may inquire as to which stocks were disposed of at a
> profit and tax the profit, and may ignore losses altogether on the

**[\*20]** disposal of other stocks, though realized at the same time and in the same transaction. * * *

Id. at 419.

Respondent also cites Curtis v. United States, 336 F.2d 714, 722 (6th Cir. 1964), which involved a corporate reorganization. Therein the Court of Appeals for the Sixth Circuit quoted Lakeside Irr. Co. extensively and disallowed the netting of losses and gains and applied the rule of Lakeside Irr. Co. to a merger transaction to which section 356 applies. This Court has cited both Curtis and Lakeside Irr. Co. approvingly. See U.S. Holding Co. v. Commissioner, 44 T.C. 323, 333 (1965).

As stated, under his alternative argument petitioner would be taxed only on a net gain of $16,797,268 on the merger transaction, an amount that can be reached only by netting his realized loss on the Archer shares against his gain to be recognized on his non-Archer shares. No authority has been cited that would support such a calculation.

With regard to petitioner's alternative argument, we conclude that petitioner may not net his realized loss on the Archer shares against the gain to be recognized and taxed on the non-Archer shares.

**[\*21]** <u>Section 6662(a) Penalty</u>

Respondent's determination of a $6,096 accuracy-related penalty under section 6662(a) relates to petitioner's filed original 2007 Federal income tax return in which petitioner reported the exchange of the 1,000 shares of USSI stock as a single block of stock, even though the 1,000 shares clearly constituted two blocks of stock with different bases and different holding periods.

Section 6662(a) imposes a penalty equal to 20% of the portion of an underpayment attributable to, among other things, "[n]egligence or disregard of rules or regulations." Sec. 6662(b)(1). For the purposes of this penalty, "the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of \* \* \* [the Internal Revenue Code], and the term 'disregard' includes any careless, reckless, or intentional disregard." Sec. 6662(c).[11]

However, the accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. <u>See</u> sec. 6664(c)(1); <u>Carlson v. Commissioner</u>, 116 T.C. 87, 107 (2001). Generally, the most important factor in determining whether a taxpayer acted in good faith is "the

---

[11]Petitioner's $30,478 understatement of income tax, <u>see</u> sec. 6662 (b)(2), does not qualify as a sec. 6662(d)(1) "substantial understatement", and the substantial authority defense of sec. 6662(d)(2)(B)(i) is not available to petitioner.

**[\*22]** extent of the taxpayer's effort to assess the taxpayer's proper tax liability."

Sec. 1.6664-4(b)(1), Income Tax Regs.

Under section 7491(c), the Commissioner has the burden of production with respect to a proposed section 6662(a) accuracy-related penalty. Once the Commissioner meets that burden of production, however, the taxpayer continues to have the burden of proof with regard to whether the Commissioner's determination of the penalty is correct. Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). The taxpayer also bears the burden of proof with respect to any reasonable cause defense. See Williams v. Commissioner, 123 T.C. 144, 153 (2004).

Respondent determined the section 6662(a) penalty using petitioner's original 2007 tax return in which petitioner treated separate blocks of stock as a single block, a treatment for which there was no reasonable basis in law and that petitioner has not even attempted to defend. Petitioner has not presented sufficient evidence to establish good-faith reliance on the advice of a tax professional or that his reliance on a tax professional was reasonable. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

For penalty purposes, petitioner points us to some authority that he argues supports his amended return and his alternative argument to the effect that related

**[\*23]** gains and losses in a merger transaction should be allowed to offset each other.[12] Therefrom petitioner argues that the acknowledged error in his original tax return should be overlooked. However, respondent's penalty is based on petitioner's position on his original return, not on his amended return. The cited authority does not support the error petitioner acknowledges was made in his original 2007 return.

We conclude that respondent has met his burden of production with regard to the accuracy-related penalty based on negligence or disregard of rules or regulations, and petitioner has failed to meet his burden of proving that he acted with reasonable cause and in good faith. We sustain respondent's determination of petitioner's liability for the accuracy-related penalty under section 6662(a).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[12]<u>See</u> the authorities cited <u>supra</u> pp. 18-19.